# 14-1965-cv

## United States Court of Appeals
*for the*
## Second Circuit

GEORG F.W. SCHAEFFLER, SCHAEFFLER HOLDING GMBH & CO. KG, INA-HOLDING SCHAEFFLER GMBH & CO. KG, SCHAEFFLER HOLDING, LP,

*Petitioners-Appellants,*

– v. –

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX**
**FOR PETITIONERS-APPELLANTS**

M. TODD WELTY
MARK P. THOMAS
LAURA L. GAVIOLI
RICHARD D. SALGADO
DENTONS US LLP
*Attorneys for Petitioners-Appellants*
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
(214) 259-0900

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Petitioners-Appellants certifies that Petitioners-Appellants Schaeffler Holding GmbH & Co. KG, INA-Holding Schaeffler GmbH & Co. KG, and Schaeffler Holding, LP have no parent corporation or any publicly-held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iv

TABLE OF ABBREVIATIONS AND GLOSSARY ........ viii

STATEMENT OF JURISDICTION ........ 1

ISSUES PRESENTED ........ 2

STANDARD OF REVIEW ........ 3

STATEMENT OF THE CASE ........ 3

I. The Nature of the Case ........ 3

II. Procedural History And Disposition Below ........ 4

STATEMENT OF RELEVANT FACTS ........ 5

A. The Summons. ........ 5

B. Schaeffler Recognized The Risk Of Litigation With The IRS And Sought Professional Advice ........ 6

C. Schaeffler Received Tax And Legal Advice From Ernst & Young And Dentons. ........ 8

D. Schaeffler And The Consortium Of Banks Aligned Their Interests And Formed A Common Strategy For Anticipated Litigation. ........ 8

SUMMARY OF THE ARGUMENT ........ 10

ARGUMENT ........ 13

I. The District Court Errs By Finding That The Work Product Doctrine Does Not Apply To The Documents At Issue. ........ 13

A. The District Court Misinterprets The "Ordinary Course Of Business" Language In *Adlman*. ........ 14

1. The "Counterfactual" Scenario That The District Court Imagines Could Never Actually Exist. ........ 18

2. The District Court Bases Its Analysis On A False Dichotomy. ... 19

3. The District Court's Analysis Is Directly Contrary To *Adlman*. ... 22

B. The District Court Errs By Basing Its Decision On An Incorrect Interpretation And Application Of Ethical Rules Governing Tax And Legal Advice. ........ 23

1. Professional Regulations Do Not Require The Sort Of Advice Reflected In The Disputed Documents. ........................................24

2. The Standards The District Court Cites Have Coexisted With The Work Product Doctrine Since The Doctrine Originated. .....28

3. The District Court's Decision Would Have Broad Application To Virtually All Tax And Legal Advice And Directly Contradicts The Purpose Of The Work Product Doctrine. .........30

C. The District Court Errs By Requiring Schaeffler To Satisfy The Fifth Circuit's "Primarily To Assist In Litigation" Test, Which This Court Has Rejected. ..........................................................................................31

1. This Court Already Considered And Rejected The Fifth Circuit's "Primarily To Assist In Litigation" Test..........................32

2. The District Court Silently Adopts The Fifth Circuit Test. ..........33

D. Under The Correct Standard, The Documents At Issue Contain Quintessential Opinion Work Product And Are Protected From Disclosure..........................................................................................36

II. The District Court Fails To Correctly Apply This Court's Standard For The Common Interest Doctrine...................................................................39

A. The District Court Applies A Bright-Line Test That Does Not Exist Under This Court's Precedent. ..........................................................39

1. The District Court's Improper Focus On "Co-Parties To Litigation" Drove Its Erroneous Determination That Schaeffler And The Banks Lacked A Common Legal Interest. ...42

2. "Co-Parties to Litigation" Is Not This Court's Standard, Nor Should It Be. ........................................................................43

B. The Bank Consortium's Interest In The Resolution Of Schaeffler's Tax Dispute Was A Common Legal Interest. ...........................................45

1. The Bank Consortium Had An "Enormous Stake"—And A Legal Interest—In The Outcome Of Schaeffler's Federal Tax Dispute.................................................................................45

2. The District Court's Formulation Needlessly Restricts the Common Interest Doctrine and Ignores the Realities of Commercial Litigation. .........................................................48

3. The District Court Erroneously Distinguishes Case Law—Including Its Own—Indicating That An Interest In A Tax Dispute Is A Common Legal Interest. ....51

C. Applying This Court's "Coordinated Strategy" Test, Communications Between Schaeffler And The Bank Consortium Remain Privileged. ......53

CONCLUSION AND RELIEF SOUGHT ....55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of America, N.A. v. Terra Nova Insurance Co.*,
211 F. Supp. 2d 493 (S.D.N.Y. 2002) ........ 51, 52

*Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*,
709 F.2d 1109 (7th Cir. 1983) ........ 31

*In re County of Erie*,
473 F.3d 413 (2d Cir. 2007) ........ 41, 53, 54

*Delaney, Migdail & Young, Chartered v. IRS*,
826 F.2d 124 (D.C. Cir. 1987) ........ 38

*In re Grand Jury Subpoena*,
274 F.3d 563 (1st Cir. 2001) ........ 44

*In re Grand Jury Subpoena*,
357 F.3d 900 (9th Cir. 2004) ........ 31

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
115 F.R.D. 308 (N.D. Cal. 1987) ........ 45

*Hickman v. Taylor*,
329 U.S. 495 (1947) ........ *passim*

*High Point SARL v. Sprint Nextel Corp.*,
No. 09-2269-CM-DJW, 2012 U.S. Dist. LEXIS 8435 (D. Kan. Jan. 25, 2012) ........ 50

*HSH Nordbank AG N.Y. Branch v. Swerdlow*,
259 F.R.D. 64 (S.D.N.Y. 2009) ........ 49

*In re Kaiser Aluminum & Chem. Co.*,
214 F.3d 586 (5th Cir. 2000) ........ 32, 35

*Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*,
212 F.R.D. 567 (E.D. Cal. 2002) ........ 49, 50

*Martin v. Bally's Park Place Hotel & Casino*,
983 F.2d 1252 (3d Cir. 1993) ........ 31

*Minn. Sch. Bds. Ass'n Ins. Trust v. Emp'rs Ins. Co. of Wausau*,
183 F.R.D. 627 (N.D. Ill. 1999) ........ 50

*Nat'l Union Fire Ins. Co. of Pittsburg v. Murray Sheet Metal Co.*,
967 F.2d 980 (4th Cir. 1992) ........ 31

*In re Regents of Univ. of Cal.*,
101 F.3d 1386 (Fed. Cir. 1996) ........ 44, 45, 48

*In re Reserve Fund Sec. & Derivative Litig.*,
Nos. 09-MD.2011 (PGG), 09 Civ.4346 (PGG), 2012 U.S. Dist. LEXIS 147723 (S.D.N.Y. Sept. 12, 2012) ........ 53

*In re Santa Fe Int'l Corp.*,
272 F.3d 705 (5th Cir. 2001) ........ 43

*In re Sealed Case*,
146 F.3d 881 (D.C. Cir. 1998) ........ 31

*Simon v. G.D. Searle & Co.*,
816 F.2d 397 (8th Cir. 1987) ........ 31

*In re Subpoena Duces Tecum Served on New York Marine and General Insurance Co.*, No. M 8-85 MHD, 1997 WL 599399 (S.D.N.Y. Sept. 26, 1997) ........ 41

*In re Sulfuric Acid Antitrust Litig.*,
235 F.R.D. 407 (N.D. Ill. 2006) ........ 49

*Travelers Cas. & Sur. Co. v. Excess Ins.*,
197 F.R.D. 601 (S.D. Ohio 2000) ........ 50

*United States v. Adlman*,
134 F.3d 1194 (2d Cir. 1998) ........ *passim*

*United States v. Aramony*,
88 F.3d 1369 (4th Cir. 1996) ........ 44

*United States v. BDO Seidman, LLP*,
492 F.3d 806 (7th Cir. 2007) .......... 44, 48

*United States v. Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) .......... 30

*United States v. Int'l Bhd. of Teamsters*,
119 F.3d 210 (2d Cir. 1997) .......... 3

*United States v. Newell*,
315 F.3d 510 (5th Cir. 2002) .......... 44

*United States v. Roxworthy*,
457 F.3d 590 (6th Cir. 2006) .......... 31, 38

*United States v. Schwimmer*,
892 F.2d 237 (2d Cir. 1989) .......... *passim*

*United States v. Textron, Inc.*,
577 F.3d 21 (1st Cir. 2009) .......... 30

*United States v. United Techs. Corp.*,
979 F. Supp. 108 (D. Conn. 1997) .......... 52

*United States v. Zolin*,
809 F.2d 1411 (9th Cir. 1987) .......... 44

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) .......... 36

*Walker Digital, LLC v. Google, Inc.*,
No. 1:11-309-SLR (D. Del. Feb. 12, 2013) .......... 50

**Statutes and Regulations**

28 U.S.C. § 1291 .......... 1

31 C.F.R. pt. 10 .......... 21, 26

I.R.C. § 6001 .......... 21

I.R.C. § 7525 .......... 4, 39, 54

I.R.C. § 7609 .......... 1

**Other Authorities**

8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024 (2d ed. 1994) .................................. 16, 32

ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 352 (1985) .................................................................................................. 24, 26

ABA Comm. on Prof'l Ethics, Formal Op. 314 (1965) ..................................................25

Federal Rule of Civil Procedure 26.......................................................16, 21, 29, 32, 36

Federal Rule of Civil Procedure 62.............................................................................4

Federal Rule of Appellate Procedure 4 .....................................................................1

Federal Rule of Appellate Procedure 32 .................................................................56

*Report of Special Task Force on Formal Opinion 85-352*, 39 TAX LAW. 635, 638 (1986) ......................................................................................................26

# TABLE OF ABBREVIATIONS AND GLOSSARY

***Parties***

| | |
|---|---|
| Petitioners-Appellants | Georg F.W. Schaeffler, Schaeffler Holding GmbH & Co. KG, INA-Holding Schaeffler GmbH & Co. KG, and Schaeffler Holding, LP. |
| Respondent-Appellee | United States of America |
| Schaeffler | Refers collectively to Petitioners-Appellants, Georg F.W. Schaeffler, Schaeffler Holding GmbH & Co. KG, INA-Holding Schaeffler GmbH & Co. KG, and Schaeffler Holding, LP. |

***Defined Terms***

| | |
|---|---|
| A____ | Joint Appendix page(s) |
| ABA | American Bar Association |
| Bank Consortium | Consortium of banks that pledged to finance the Conti tender offer pursuant to a loan agreement |
| Conti | Continental AG |
| Court | United States Court of Appeals for the Second Circuit, or the Supreme Court of the United States, according to context. |
| Dentons | Dentons US LLP (and predecessors Sonnenschein, Nath & Rosenthal, LLP and SNR Denton US LLP). |
| district court | United States District Court for the Southern District of New York, the Honorable Gabriel W. Gorenstein, Magistrate Judge, presiding. |
| DOJ | Department of Justice |
| Ernst & Young | Schaeffler's tax advisor and recipient of the IRS's third-party record keeper Summons. |
| IDR | Information Document Request |

| | |
|---|---|
| I.R.C. | Internal Revenue Code, Title 26, United States Code |
| IRS | Internal Revenue Service |
| memorandum | The 321-page Ernst & Young memorandum, reviewed by the district court *in camera*, and included in the record under seal. |
| Order | The district court opinion and order denying Schaeffler's Petition to Quash, dated May 28, 2014. |
| Petition to Quash | Petitioners-Appellants' Petition to Quash Internal Revenue Service Summons, dated July 12, 2013. |
| Ringfencing provisions | Provisions of an agreement between Schaeffler and the Bank Consortium, whereby the Bank Consortium would permit, subject to certain limitations, the effective subordination of its claims to the payment of Schaeffler's personal tax liabilities. |
| Rödl | Rödl & Partners, Schaeffler's tax return preparer |
| Summons | IRS third-party summons issued to Schaeffler's tax advisor Ernst & Young; the subject of Petitioners-Appellants' Petition to Quash. |

## STATEMENT OF JURISDICTION

This is an appeal from the May 28, 2014 Opinion and Order of the Honorable Gabriel W. Gorenstein, Magistrate Judge, Southern District of New York, denying Petitioners-Appellants' Petition to Quash Internal Revenue Service Summons issued to third-party record keeper, Ernst & Young.

Schaeffler[1] filed the petition in the United States District Court for the Southern District of New York pursuant to I.R.C. § 7609(b)(2). The district court had jurisdiction under I.R.C. § 7609(h)(1).

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court disposing of all claims, and the order denying the petition is a final appealable order. *See* I.R.C. § 7609(h)(1).

This appeal is timely under Rule 4(a)(1) of the Federal Rules of Appellate Procedure because Schaeffler filed the Notice of Appeal on June 6, 2014.

[1] Petitioners-Appellants Georg F. Schaeffler, Schaeffler Holding GmbH & Co. KG, INA-Holding Schaeffler GmbH & Co. KG, and Schaeffler Holding, LP are collectively referred to as "Schaeffler."

## ISSUES PRESENTED

1. Whether the district court erred by denying work-product protection to legal opinions and analysis that reflect the "most intimate strategies and assessments" of Schaeffler's tax and legal advisors regarding the risks, potential arguments, and probable outcomes of anticipated litigation.

2. Whether the district court erred by holding that Schaeffler and the Bank Consortium did not share a common legal interest when the Bank Consortium subordinated its claims pursuant to its agreement to fund €885 million (over US$1.3 billion) of Schaeffler's tax liabilities, and when prior case law recognizes that minimizing tax liabilities is a common legal interest.

## STANDARD OF REVIEW

Because the district court's decision below turns on errors of law under this Court's precedent, this Court reviews both issues de novo. *See United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997).

## STATEMENT OF THE CASE

### I. The Nature of the Case

On July 12, 2013, Schaeffler moved to quash a third-party administrative summons issued by the Internal Revenue Service ("IRS") to Schaeffler's tax advisor Ernst & Young in connection with an IRS audit (the "Summons"). On its face, the primary purpose of the Summons is to obtain confidential tax advice given to Schaeffler, demanding "all documents created by Ernst & Young, including but not limited to **legal opinions, analysis** and **appraisals**, that were provided to parties outside the Schaeffler Group" related to certain refinancing and restructuring transactions undertaken by Schaeffler. A46 (emphasis original).

The documents the IRS seeks were created after Schaeffler engaged Ernst & Young and a law firm, Dentons US LLP ("Dentons"),[2] to give tax advice regarding a massive debt refinancing and related corporate restructuring. Ernst & Young prepared detailed tax memoranda and other analyses that identified potential U.S. tax consequences and analyzed possible IRS challenges and the likelihood of success if

[2] Dentons was previously known as Sonnenschein, Nath & Rosenthal, LLP and SNR Denton US LLP in the years at issue. All are collectively referred to herein as "Dentons."

such issues were litigated in court. Schaeffler recognized the importance of maintaining work-product protection and attorney-client privileges and, as the lower court noted, took careful measures to restrict the disclosure of tax advice.

## II.    Procedural History And Disposition Below

Schaeffler timely filed a Petition to Quash the Summons on July 12, 2013, asserting the work product doctrine and the attorney-client privilege (directly and as extended to tax practitioners pursuant to I.R.C. § 7525) to protect the requested documents from disclosure.[3]    In support, Schaeffler submitted nine separate declarations including Schaeffler's advisors and attorneys involved in the transaction. Schaeffler also provided volumes of privilege logs to the court, describing over 5,000 documents responsive to the Summons, but withheld as either attorney-client privileged or work-product protected.

On May 28, 2014, Magistrate Judge Gabriel W. Gorenstein, entered an Opinion and Order denying Schaeffler's Petition to Quash (the "Order"). A1727.

Schaeffler appeals to this Court from the Order dated May 28, 2014. Schaeffler filed the Notice of Appeal on June 6, 2014. A1762. On June 6, 2014, Schaeffler moved the district court for a stay pending appeal, pursuant to Rule 62(g) of the Federal Rules of Civil Procedure. That motion was granted on June 9, 2014.

---

[3] On November 8, 2013, Schaeffler timely filed an Amended Petition to Quash the Summons, asserting privilege and work-product protection over documents and communications from Houlihan Lokey, a valuation expert retained by Schaeffler's legal counsel.

## STATEMENT OF RELEVANT FACTS

### A.    The Summons.

The IRS has enjoyed broad access to Schaeffler's financial records and other relevant materials in the two years since the IRS officially began its audit of Schaeffler's 2009 and 2010 U.S. federal income tax returns.  A138-39, 1766.  During that time, the IRS has issued 110 Information Document Requests ("IDRs"), with two more "draft" IDRs in process that raise a new issue.  A1766.  In response, Schaeffler has thus far produced over 35,000 pages of non-privileged documents to the IRS.  A1735, 1766.  Those documents include operative refinancing and restructuring agreements, books and records, tax return work papers, corporate chronologies, appraisals, and other tax return preparation files.  A1766.  Schaeffler also voluntarily provided the IRS with detailed 79-page disclosures on March 15, 2013, that contain illustrations and descriptions of each step of the refinancing and restructuring transactions, and identify the material tax issues implicated by the steps. *Id.*

Despite the voluminous production it has already obtained, however, the IRS now demands more.  The Summons's express purpose is to obtain confidential tax advice given to Schaeffler by demanding "all documents created by Ernst & Young, including but not limited to **legal opinions, analysis** and **appraisals**, that were provided to parties outside the Schaeffler Group" related to certain refinancing and restructuring transactions undertaken by Schaeffler.  A46 (emphasis original).  These

documents include the most sensitive mental impressions and opinions of Schaeffler's tax advisors, including their candid assessment of potential arguments and the strengths and weaknesses of Schaeffler's positions in the audit now underway.

### B. Schaeffler Recognized The Risk Of Litigation With The IRS And Sought Professional Advice.

Schaeffler and Schaeffler's advisors expected the current IRS examination at issue given the massive debt refinancing and related corporate restructuring that occurred following Schaeffler's July 30, 2008 tender offer to acquire equity in a German supplier of automotive and industrial parts.

Schaeffler is in the automotive and industrial parts business. A1728-29. During the 2008 economic crisis, Schaeffler acquired a far greater-than-expected share of Continental AG ("Conti")—another automotive and industrial parts supplier. A1729. On July 30, 2008, Schaeffler made a tender offer to buy shares of Conti at an offer price expected to limit Schaeffler's acquisition to less than fifty-percent of Conti's outstanding shares. *Id.* Two days prior to the tender offer closing, however, Lehman Brothers Holdings Inc. declared bankruptcy and, subsequently, the economy collapsed. A50, 1729. As a result, most Conti shareholders accepted the offer. A1729. Schaeffler acquired 89.9% of Conti's outstanding shares, and Schaeffler incurred an unanticipated €11 billion acquisition cost funded almost entirely with debt from a consortium of banks, which pledged to finance the offer pursuant to a loan

agreement (the "Bank Consortium"). *Id.* This unexpected result necessitated substantial corporate restructuring and debt refinancing. *Id.*

The legal and tax issues were large, esoteric, and extremely complex both from a substantive standpoint and due to the sheer number of moving parts that had to be suitably meshed together. A76-77, 101, 1756. As a result, Schaeffler recognized from the earliest planning stages of the refinancing and restructuring that an IRS audit and litigation over the tax consequences was "highly probable." A54, 1755. All parties involved in the restructuring and refinancing shared this view. A54, 76-77, 1731, 1754. Mr. Schaeffler's belief that the IRS would challenge the 2009 and 2010 tax returns was reinforced by the fact that he had recently and routinely been subjected to IRS audits. A56, 1731-32.

Because Schaeffler anticipated an IRS audit and litigation with the IRS, Schaeffler sought advice from lawyers and tax practitioners. A1729-31. Schaeffler hired outside tax advisors and attorneys at Ernst & Young and Dentons to identify and advise on the federal tax implications[4] of the refinancing and restructuring, to identify and analyze possible IRS challenges to the tax treatment of the transactions at issue, and to weigh the potential litigation risks. A51-52, 101-104, 1729-31.

[4] Schaeffler does business globally and incurs tax liabilities in multiple jurisdictions. References herein to "tax" issues or liabilities generally refer to U.S. federal tax issues arising under the Internal Revenue Code, Title 26, United States Code, unless otherwise stated.

### C.    Schaeffler Received Tax And Legal Advice From Ernst & Young And Dentons.

Ernst & Young prepared tax memoranda and other tax analyses that identified potential tax consequences of the refinancing and restructuring and analyzed possible IRS challenges to Schaeffler's tax treatment of the transactions.  A1730.  For example, Ernst & Young memorialized key tax advice and analysis in a 321-page memorandum.  A72, 1730, 1754.  That memorandum contains Ernst & Young's analysis and advice concerning the tax treatment of various aspects of Schaeffler's refinancing and restructuring, including an analysis of possible challenges by the IRS.  A72-73, 1730, 1754.  It analyzes the strengths and weaknesses of Schaeffler's tax and legal positions, and provides Ernst & Young's opinion of the risks and probable outcome of litigation or other adversarial proceedings against the IRS in relation to the transactions.  A55-56, 61, 72-73, 106, 1730, 1754.

Dentons likewise provided Schaeffler with tax and legal advice—in oral and written form—to evaluate the tax consequences of the refinancing and restructuring, assess the arguments the IRS would likely make in any dispute, and weigh the potential risks Schaeffler would face if the tax consequences of the transactions were litigated or otherwise challenged by the IRS.  A53, 103, 1730.

### D.    Schaeffler And The Consortium Of Banks Aligned Their Interests And Formed A Common Strategy For Anticipated Litigation.

Schaeffler communicated with Dentons and Ernst & Young in confidence and pursuant to privileged relationships.  A1732.  Schaeffler, Dentons, and Ernst &

Young have maintained the confidentiality of those communications.  A1732, 1752-53.

Like Schaeffler, the Bank Consortium and its legal advisors also recognized the certainty of an IRS audit and litigation.  A77.  Tax advisors for both Schaeffler and the Bank Consortium identified, and worked closely to analyze and address, numerous complex tax issues.  A52, 1732.

Because an audit was likely and a successful IRS challenge could result in additional tax liabilities, Schaeffler and the Bank Consortium shared a common legal interest as to Mr. Schaeffler's personal tax liabilities and shared the common goals of planning to defend an IRS examination, minimizing IRS adjustments following examination, and if necessary, preparing to contest any proposed tax adjustment.  A52.  Schaeffler, the Bank Consortium, and their advisors developed a common plan to achieve those goals.  A52, 77.

Schaeffler and the Bank Consortium reached an agreement in principle because they anticipated tax audits, investigations, and the good-faith challenge of proposed tax adjustments by the IRS.  A53, 77, 1733.  The Bank Consortium would permit, subject to certain limitations, effective subordination of its claims to the payment of Mr. Schaeffler's personal tax liabilities (referred to herein as the "Ringfencing provisions").  A52, 104, 1733.  Under the Ringfencing provisions, Schaeffler could prioritize up to €885 million in dividends for Mr. Schaeffler's personal tax liabilities.

A53, 60.  In addition, the Bank Consortium agreed to provide an additional line of credit to pay Mr. Schaeffler's tax liabilities up to €250 million.  A105, 1733.

Because of the common legal interest with respect to Mr. Schaeffler's personal tax liabilities, the Ringfencing provisions required Schaeffler to notify the Bank Consortium of a material audit or investigation.  A53, 77, 1733.  The Bank Consortium also retained a right of refusal regarding major actions taken by Schaeffler in the anticipated dispute with the IRS, including paying the tax, suing for refund, or settling the dispute.  A88, 98.  Schaeffler and the Bank Consortium recognized the need for all necessary measures to be taken to maintain the confidentiality and privileges of any information disclosed in that process.  A53, 77-78.

In the course of formulating a common legal strategy, Schaeffler and the Bank Consortium agreed to share legal analyses and memorialized their common interest and expressed their legal obligations to maintain the confidentiality of the information shared in an "Attorney Client Privilege" Agreement.  A1733.  Under that agreement, the parties shared certain documents containing privileged and protected tax and legal advice.  A1734.

To the best of Schaeffler's, Dentons', and the Bank Consortium's belief and understanding, confidentiality has been maintained through the present.  A55, 107, 78.

## SUMMARY OF THE ARGUMENT

Six years ago, Schaeffler had to navigate a maze of complex tax issues after unexpectedly acquiring a massive, multi-billion euro interest in another company.  It

was obvious to everyone involved that the IRS would audit Schaeffler's tax returns reporting this acquisition. Litigation was not only likely, but—as the district court concedes—was highly probable. A1755. Rather than proceed blindly, Schaeffler hired tax advisors at Ernst & Young and lawyers at Dentons to look ahead to the anticipated audit and litigation, predict what challenges the IRS would raise and the likely arguments and counter-arguments, and assess Schaeffler's likelihood of success. The IRS has now begun the expected audit of Schaeffler's tax returns, and wants that analysis as a roadmap to the strengths and weaknesses of Schaeffler's positions. The district court—in conflict with this Court's precedent—ordered that the analysis be produced. This is reversible error.

Under this Court's precedent, the documents that the IRS seeks fall within the most protected category of work product. *See United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir. 1998). In refusing to protect those documents from disclosure, the district court contradicts this Court's precedent in *Adlman*. *See id.* In *Adlman*, the Court held that the work product doctrine protects documents prepared in anticipation of litigation, even when they serve a dual purpose of assisting in business dealings. *Id.* at 1202. Here, the district court agrees that Schaeffler anticipated litigation and that the disputed documents analyze the strengths, weaknesses, and potential outcome of that litigation. Yet the district court withholds work-product protection altogether based on the theory that tax advisors and lawyers advising on complex and heavily regulated transactions must always provide advice *as if* litigation

is expected—even when it isn't. Accordingly, under the district court's reasoning, the advice (1) would be the same with or without the anticipation of litigation; (2) is therefore always in the "ordinary course of business"; and (3) thus, falls outside the scope of the work product doctrine. The district court's approach is wrong. If let stand, it would upend this Court's precedent in *Adlman*, effectively adopting the Fifth Circuit's standard—which this Court already rejected—and would result in the blanket denial of work-product protection to dual purpose documents unless they are expressly created for use in litigation.

Attorney-client privilege, as extended under the common interest rule, also protects the documents the IRS seeks. But again, the district court's decision contradicts this Court's precedent. In *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989), this Court held that parties may share a common legal interest and enjoy the protection of the common interest doctrine even if they are not co-defendants in a pending litigation. Yet in the decision below, the district court refused to apply the common interest doctrine to Schaeffler and the Bank Consortium that handled the massive refinancing because—despite sharing a common legal interest in complying with federal tax laws and sharing an "enormous stake" in the outcome of an IRS dispute—they were not co-defendants in a pending litigation. This too violates Second Circuit precedent and warrants reversal of the decision below.

It is no exaggeration to say that if the district court's ruling stands, no company or private person engaged in complex, regulated transactions—whether subject to IRS

regulations, Sarbanes-Oxley, the Foreign Corrupt Practices Act, or any other regulatory scheme—will be able to rely on the work product or common interest doctrines to protect materials generated in anticipation of future litigation. The chilling effect would be severe. As the Supreme Court has warned, "much of what is now put down in writing would remain unwritten" for fear of production, and legal advice might be marred by "[i]nefficiency, unfairness and sharp practices," and the "effect on the legal profession would be demoralizing." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

## ARGUMENT

### I. The District Court Errs By Finding That The Work Product Doctrine Does Not Apply To The Documents At Issue.

In this Circuit and most other circuits, the work product doctrine protects documents prepared "in anticipation of litigation" even if "their primary, ultimate, or exclusive purpose is to assist in making [a] business decision." *Adlman*, 134 F.3d at 1198. Schaeffler's tax advisors and lawyers prepared the documents in this case in anticipation of litigation, and the documents contain opinion work product that reflects the advisors' and lawyers' thoughts, impressions, and analyses. Such core work product ordinarily receives the highest level of protection. The district court denies that protection, however, based on multiple errors of legal interpretation.

First, the district court misinterprets language in *Adlman* concerning documents created in the "ordinary course of business" in a way that causes the exception to

swallow the rule and effectively deny work-product protection in any complex transaction.

Second, the district court misinterprets and misapplies ethical rules for Schaeffler's advisors and lawyers to conclude that Schaeffler's advisors and lawyers would have provided Schaeffler with the same advice, in the same form, even if litigation were not anticipated.

Third, the district court requires Schaeffler to satisfy the Fifth Circuit's "primarily to assist in litigation" standard for work-product protection, which this Court has expressly rejected. *See Adlman*, 134 F.3d at 1203.

The district court's decision, if let stand, would virtually destroy the work product doctrine in situations when confidential legal analysis is most needed: complex transactions subject to substantial regulatory requirements. Simply put, there would be no work-product protection for pre-transaction legal advice. When the district court's legal errors are corrected, however, the documents are protected as work product under this Court's established standard.

### A. The District Court Misinterprets The "Ordinary Course Of Business" Language In *Adlman*.

"Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection . . . merely because it is created in order to assist with a business decision." *Adlman*, 134 F.3d at 1202. The documents at issue are therefore work product because—though also used to assist in

business decisions—Schaeffler solicited their creation to predict the outcome of anticipated litigation.

The district court agrees that Schaeffler anticipated litigation—acknowledging litigation was "highly probable"—and also finds that Schaeffler did not waive work-product protection, but nonetheless withholds protection from the documents. A1751, 1755, 1759. To do so, the district court seizes upon a single line from *Adlman* that documents that "would have been created in essentially similar form" had litigation not been anticipated are not work product. A1755. The district court misinterprets this language.

Properly understood, the language merely explains that documents prepared in the ordinary course of business—*i.e.*, documents that purely reflect material underlying facts—are discoverable. The relevant passage from *Adlman* states:

> [T]he "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.

134 F.3d at 1202. In other words, every document a party creates is not automatically work product simply because the party anticipates litigation. If a company summarizes every sales transaction in its ordinary course of business, for example, a summary is not suddenly work product because the company anticipates being sued. That business records with underlying factual relevance to a litigation may not be protected work product is a logical application of the work product doctrine as it has

existed since even before codification in Rule 26 of the Federal Rules of Civil Procedure. *See* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024 (2d ed. 1994) (discussing common law limitations on work-product protection).

Correctly applied, this language has no effect on the analysis here: Schaeffler asked its advisors to predict the likely arguments and outcomes of potential litigation *because* Schaeffler anticipated litigation. The disputed documents are distinct from the supporting records and work papers that Schaeffler's external return preparer gathered and created in the ordinary course of annually completing Schaeffler's federal income tax returns, and which Schaeffler has largely already organized and produced to the IRS. It was not the "ordinary course of business" for Schaeffler—or any other businessperson—to hire advisors to predict the outcome of litigation that no one anticipates will ever occur, let alone ask them to do so in the degree of detail found in the disputed documents. *See, e.g.*, Andrew Velarde, *District Court Holding 'Eviscerates' Work Product Protection*, TAX NOTES, June 2, 2014, at 998 (observing, in relation to district court's opinion here, that "it is uncommon for taxpayers to receive a tax memo of such a length and form unless they expect litigation"); Robin L. Greenhouse, Michael Kelleher, & Randolph Herndon, *District Court Opinion Guts Work Product Protection for Tax Opinions*, TAX NOTES, July 21, 2014, at 329 ("there is no regulatory requirement that would have required the [Ernst & Young tax

memorandum] to be prepared in essentially the same form irrespective of Schaeffler's anticipation of litigation[]").

All of the requirements of the work product doctrine under this Court's "because of the prospect of litigation" formulation were thus met:

- Litigation was anticipated.

- Schaeffler solicited creation of the documents to analyze the potential arguments and outcomes in the litigation.

- The documents contain the candid mental impressions and analysis of Schaeffler's attorneys and advisors assessing Schaeffler's strengths and weaknesses in the litigation.

- Production of this non-factual, opinion work would prejudice Schaeffler and give the IRS an unfair advantage in litigation, contrary to the purpose of the work product doctrine.

This is where the district court's analysis should have ended—but did not.

Instead, the district court unnecessarily follows the "would have been created in essentially similar form" language down a rabbit hole.  The district court takes it as an invitation to imagine what it calls a "counterfactual" scenario in which everything about the transaction was the same, except that no one anticipated litigation.  A1755. The district court then sets up a false dichotomy:  Schaeffler either disregards the law except when Schaeffler expects to be sued, or always solicits voluminous and detailed analysis of potential litigation, even when it does not anticipate litigation.  A1755-57. None of this speculation is supported by the record, and it results in an outcome contrary to *Adlman*.

1. <u>The "Counterfactual" Scenario That The District Court Imagines Could Never Actually Exist.</u>

The district court begins its work product analysis with an elaborate and unnecessary speculation:

> While we have described this [work product determination] as a factual determination, in reality it is a counterfactual determination because it requires the Court to imagine what 'would have' happened in a world where Schaeffler did not anticipate litigation as to the restructuring and refinancing transactions but everything else was exactly the same—in other words, Schaeffler still found himself acquiring the unexpectedly large share of Conti stock and still needed to engage in a refinancing and restructuring arrangement that would comply with federal tax laws.

A1755. Based on this imagined scenario—which *Adlman* does not call for—the district court concludes that any document created to assist with planning a complex transaction and compliance with tax law requirements—even if it is an evaluation of litigation risks and likely outcomes—would have been created anyway given the complexity of the transaction and need to comply with the law. A1755-57. It was therefore created "in the ordinary course of business" and, as a matter of law, is not work product. *Id.* This is wrong.

One of the fatal problems with the district court's exercise is that the size and complexity of the transaction and Schaeffler's anticipation of litigation are inseparable. The refinancing and restructuring of Schaeffler's €11 billion acquisition debt was one of the largest in European history. It caused Schaeffler to acquire an indirect majority interest in a large foreign corporation, and subjected Schaeffler to unprecedented U.S. tax liability exposure with international implications exacerbated by a global recession,

debt, and insolvency concerns for both Schaeffler and the Bank Consortium. Anyone facing those circumstances would anticipate IRS scrutiny and litigation. The two cannot be divorced and to imagine otherwise is folly. Nevertheless, the district court bases its decision not on the facts in this case as they actually exist, but instead on a hypothetical totally disconnected from facts in this or any other record.

The district court's approach also creates a bright-line test that effectively bars the work product doctrine from ever applying to legal advice in connection with large, complex transactions. Under the district court's reasoning, such transactions will always demand the hiring of outside tax advisors and legal counsel. The district court thus artificially expands the "ordinary course of business" of companies engaged in such transactions to include virtually *all* legal advice. Under such an approach, the only documents that could conceivably still be work product would be documents expressly created *for use* in litigation. This approach casts aside this Court's "dual purpose documents" precedent in *Adlman* and embraces the Fifth Circuit's minority test, which this Court and virtually every other circuit has previously rejected. *See infra* Section (I)(C)(2).

2. <u>The District Court Bases Its Analysis On A False Dichotomy.</u>

The district court compounds its error by basing its analysis on a false dichotomy in which Schaeffler either (1) is an illegitimate businessperson who conducts business with flagrant disregard for tax laws except when Schaeffler "fears

being sued" or (2) would have solicited all the same analysis at issue now, even where Schaeffler had not anticipated litigation, thus eliminating work-product protection:

> An unstated premise of Schaeffler's argument in this petition is that there was no reason for him to engage in the detailed and complex process of resolving the 'complicated and unusual' tax issues that surrounded the transaction other than to prepare for litigation. If he intends to make such an argument, it would require this Court to find that Schaeffler had no interest in complying with federal tax laws except to the extent it assisted him in the event there were an audit and subsequent litigation. However, Schaeffler has not contended—nor do we have any reason to find—that he makes efforts to comply with federal tax laws only in situations where he fears being sued. Accordingly, we assume a scenario under which Schaeffler is a legitimate businessperson who has a desire to operate his companies in accordance with the law and in accordance with his legal duties . . . .
>
> . . . .
>
> . . . Accordingly, given our assumption that Schaeffler is a rational businessperson who routinely makes efforts to comply with the law, we find that, even had he not anticipated an audit or litigation with the IRS, he still would have had to obtain the type of legal assistance provided by Ernst & Young to carry out the refinancing and restructuring transactions in an appropriate manner.

*See* A1755, 1757.

The district court's reasoning fails for several reasons. First, the supposed dichotomy ignores a substantial middle ground. That a taxpayer in Schaeffler's situation would have sought out some sort of advice regarding the most advantageous tax treatment does not mean that, without anticipation of litigation, Schaeffler would have sought out the same advice in the same form. It certainly does not mean that the advice would have been in writing, would have expressly anticipated "possible challenges by the IRS," or would have considered "at great length the arguments and

counter-arguments that could be made" by the taxpayer and the IRS in litigation. *See* A1730, 1754. Nothing in the tax code or regulations required Schaeffler, as a "legitimate businessperson," to obtain or maintain the tax advice at issue in the ordinary course of business. *See* Fed. R. Civ. P. 26 advisory committee notes (1970 amend.); *see also* Circular 230, 31 C.F.R. § 10.37 (stating that practitioner "may"—*not* shall—offer written advice on taxpayer reporting positions). Even the IRS's most demanding reporting requirement—which applies only to certain corporations with recorded reserves for certain tax positions and has no application here—requires only a "concise description" of each uncertain tax position. *See* 2010 I.R.S. Form 1120 Schedule UTP, Instructions at 4. That description "should not exceed a few sentences," and "should not include an assessment of the hazards of a tax position or an analysis of the support for or against the tax position." *Id.* at 4-5; Financial Accounting Standards Board Interpretation No. 48 ("FIN 48") ¶ B34 (Jun. 2006) (stating that the "Board does not believe that a legal tax opinion must be obtained" for purposes of making corporate reserves based on uncertain tax positions).

The tax reporting requirements that actually applied to Schaeffler only require taxpayers to keep records, render statements, file returns, and comply with such rules and regulations prescribed by the Secretary. *See* I.R.C. §§ 6001; 6011. A "legitimate businessperson" such as Schaeffler thus has no legal obligation to obtain or maintain tax opinions as to the consequences of contemplated actions. Accordingly, the length, detail, and scope of the 321-page tax memorandum and the other documents

created by Ernst & Young far exceeds the type of tax advice generally required. *See Adlman*, 134 F.3d at 1195 (noting extraordinary detail contained in 58-page memorandum); Velarde, *Holding 'Eviscerates' Work Product Protection*, *supra* at 16; Greenhouse et al., *Opinion Guts Work Product Protection*, *supra* at 16.

Second, the district court's reasoning further confirms that the district court is in fact applying the Fifth Circuit's minority "primarily to assist in litigation" test for work product rather than this Circuit's "because of anticipated litigation" test. The district court wrongly assumes that Schaeffler is arguing that the solicited advice was "to prepare for litigation" and to "assist [it] in the event there were an audit and subsequent litigation." A1755. But "preparing for litigation" and "assisting in litigation" is not this Court's standard for work-product protection. *See infra* Section I(C)(2). Rather, under this Court's standard, Schaeffler merely must show that it sought out analysis of potential litigation because it anticipated litigation with the IRS.

3. <u>The District Court's Analysis Is Directly Contrary To *Adlman.*</u>

In *Adlman*, this Court provided examples of documents that should be protected because they are not mere "ordinary-course" business documents. These examples refute the district court's reasoning. For example,

> [a] business entity prepares financial statements to assist its executives, stockholders, prospective investors, business partners, and others in evaluating future courses of action. Financial statements include reserves for projected litigation. The company's independent auditor requests a memorandum prepared by the company's attorneys estimating the likelihood of success in litigation and an accompanying analysis of

> the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses.

*Adlman*, 134 F.3d at 1200.

This Court explained that the documents would be protected because they would contain "legal analysis that falls squarely within *Hickman's* area of primary concern—analysis that candidly discusses the attorney's litigation strategies [and] appraisal of likelihood of success." *Id.* The documents at issue here are even more sensitive and worthy of protection. Missing the forest for the trees, however, the district court's approach in this case would—if faced with this Court's example—withhold work-product protection on the theory that a business entity would need such statements and analysis to comply with the law even if litigation were not anticipated.

### B. The District Court Errs By Basing Its Decision On An Incorrect Interpretation And Application Of Ethical Rules Governing Tax And Legal Advice.

The district court's overreaching interpretation of the "ordinary course of business" language next leads the district court to misinterpret and misapply ethical standards governing tax and legal advice. According to the district court, those standards required Schaeffler's advisors at Ernst & Young to provide the advice in the same manner regardless of the anticipated litigation, making them the "ordinary course of business." A1749, 1756-59. That is incorrect. Even ignoring this Court's

precedent in *Adlman*, the district court's misapplication of these standards warrants reversal and, if let stand, would set a dangerous precedent.

1. Professional Regulations Do Not Require The Sort Of Advice Reflected In The Disputed Documents.

The district court's analysis collapses based on misunderstandings of tax advisement regulations. Contrary to the district court's decision, nothing in the professional and ethical rules or standards created an "independent responsibility" for Ernst & Young to prepare its advice in the same form irrespective of Schaeffler's anticipation of litigation. *See* A1757-59; *see also* ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 352 (1985) ("No additional burden is imposed by the requirement . . . ."). The district court, however, incorrectly divines such a responsibility from a cluster of closely related regulations and professional standards that prohibit tax advisors from recommending tax positions that are highly unlikely to be sustained in the event of an audit. A1757-58. But these standards do not require a particular form or level of detail for tax advice.[5] Instead, they prohibit what is often referred to as playing the "audit lottery"—which is the practice of advising taxpayers

[5] Although as a general proposition, all tax advice must comply with ethical standards like Circular 230, not all tax advice is protected by the work product doctrine. Specifically, tax advice used to prepare a tax return may lose its work-product protection due to waiver upon filing the tax return. Here, Schaeffler has not claimed work-product protection for return preparation advice given by, or provided to, Rödl & Partners, who prepared Schaeffler's tax returns. However, tax advice given in anticipation of litigation—falling outside the scope of tax return work papers—is subject to work-product protection. Accordingly, Schaeffler has claimed work-product protection for documents created by Ernst & Young and Dentons and not provided to Rödl to use in preparation of the tax returns at issue.

to "adopt aggressive (doubtful, albeit reasonable) positions" relying "not so much on their conviction that they will be able to prevail on the merits if challenged as on their firm knowledge that they have a 98% chance of never being challenged." BERNARD WOLFMAN & JAMES P. HOLDEN, ETHICAL PROBLEMS IN FEDERAL TAX PRACTICE 59 (2d ed. 1985).

The district court cites three standards:

- Treasury Dept. Circular 230 (stating "the practitioner must not take into account the possibility that a tax return will not be audited");

- Treas. Reg. § 1.6694-2(b) (stating the "possibility that the position will not be challenged by the [IRS] . . . is not to be taken into account"); and

- American Institute for Certified Public Accountants Statements on Standards for Tax Services No. 1 (stating that "[a] member should not recommend a tax return position . . . unless the member has a good-faith belief that the position has at least a realistic possibility of being sustained administratively or judicially on its merits if challenged").

A1757-58. These overlapping standards are all based on the American Bar Association's standard for tax attorneys and all target the same concern, which is inapplicable here. The ABA first adapted its ethical standards for attorneys to the tax context in 1965, when it specified that a lawyer advising his client on tax returns must have a "reasonable basis" for the positions taken. ABA Comm. on Prof'l Ethics, Formal Op. 314 (1965). But over time, this standard gave rise to complaints from the tax bar, the IRS, and members of Congress that many lawyers and other tax professionals were misconstruing the standard "to support the use of any colorable

claim on a tax return to justify exploitation of the lottery of the tax return audit selection process." ABA Formal Op. 352. As the ABA Standards of Tax Practice Committee observed:

> [T]he ethical standard set by "reasonable basis" had become a low one. To many it had come to permit any colorable claim to be put forth; to permit almost any words that could be strung together to be used to support a tax return position.

Paul J. Sax et al., *Report of Special Task Force on Formal Opinion 85-352*, 39 TAX LAW. 635, 638 (1986).

In response to these concerns, the ABA issued Formal Opinion 85-352 in 1985, which restated the governing standard as a "realistic possibility of success if the matter is litigated" and required lawyers to advise clients whether a position is likely to withstand litigation. ABA Formal Op. 352. The other regulations governing tax practitioners soon followed suit. The IRS sought to codify the new standard as part of Circular 230 at 31 C.F.R. § 10, *see* Regulations Governing the Practice of Attorneys, Certified Public Accountants, Enrolled Agents and Enrolled Actuaries Before the Internal Revenue Service, 51 FED. REG. 29,113 (proposed Aug. 14, 1986) (to be codified at 31 C.F.R. pt. 10), and amended Circular 230 in 1994, *see* 59 Fed. Reg. 31,523, at 31,527 (June 20, 1994) (to be codified at 31 C.F.R. § 10.34), to prohibit a preparer from signing a return containing a position that "does not have a realistic possibility of being sustained on its merits . . . unless the position is not frivolous, and is adequately disclosed to the Service." 59 Fed. Reg. 31,527 (June 20, 1994) (codified

at 31 C.F.R. pt. 10, § 10.34(a)(1)). Similar revisions were made to the penalty provisions of the regulations. *See* Treas. Reg. § 1.6694-1(a)(1992). The American Institute for Certified Public Accountants likewise enacted parallel standards in 1988. *See* Tax Return Positions, Statements on Responsibilities in Tax Practice, No. 1, §§ 1.02, 1.03 (Am. Inst. of Certified Pub. Accountants 1988 Rev.).

The objective of these standards—and the language relied on by the district court now—is simple: tax attorneys and advisors cannot advise clients to take aggressive tax positions that have only a threadbare chance of surviving litigation, based on the gamble that they will never be audited. *See* Sax et al., *supra,* at 638 (stating that "good faith" is higher standard approaching one-third likelihood of success if litigated). This goes to the mindset of the advisor and the approach he or she must take to the analysis and advice, but these particular standards do not require a certain form for the written advice. *See id.* at 640 ("This may or may not require that a formal written opinion be rendered."). Yet the district court makes the unsupported leap that those standards required Schaeffler's advisors to create the disputed documents "in the same form irrespective of any concern about litigation." A1759. There is a critical disconnect. Prohibiting advisors from doling out advice based on the assumption a tax return would never be audited is a far cry from requiring advisors to include detailed, written analysis of the various possible outcomes and arguments in their advice. Nothing requires the sort of analytical roadmap through anticipated litigation that Ernst & Young provided to Schaeffler. What must be

"considered" and what must be provided in written form (if they are provided in written form at all) are two different concepts which the district court wrongly conflates as a means of withholding work-product protection.

2. The Standards The District Court Cites Have Coexisted With The Work Product Doctrine Since The Doctrine Originated.

The district court analyzes the issues in this case as if the standards governing tax advice are new or somehow unique to this case. They are not. These standards have peacefully coexisted with the work product doctrine since the doctrine's inception.

Attorneys have performed their duties under these responsibilities for more than a century without disturbing the work product doctrine. *Adlman* was also a tax case; it also concerned advice by tax advisors about compliance with IRS regulations. 134 F.3d at 1195. And the advisor was subject to essentially the same ethical rules requiring advisors to fully evaluate the relevant legal issues and the possibility of success if litigated that applied to Schaeffler's advisors in this case. Yet the Court did not contemplate denying work-product protection because of compliance with those professional standards.

Likewise, the attorney in *Hickman* had the same sort of obligations that the district court attributes to Schaeffler's tax advisors and attorneys. Yet, when the Supreme Court announced the work product doctrine in 1947, professional standards had no bearing on the Court's ruling. *See generally Hickman*, 329 U.S. 495. But under

the district court's reasoning, the result would have been different. The witness statements at issue in *Hickman* would be denied work-product protection because of the lawyer's professional obligations to always act with an eye toward litigation. The Supreme Court however, saw no such hindrance. Similarly, Congress and the Advisory Committee made no mention of professional standards as grounds for denying the work-product protection when codifying the doctrine in the Federal Rules of Civil Procedure 26(b)(3) in 1970. *See* FED. R. CIV. P. 26(b)(3) advisory committee notes.

Under the district court's reasoning, however, lawyers' and tax advisors' advice would always be substantially the same, regardless of whether litigation is actually anticipated. A1759. According to the district court, a client who seeks legal advice because he knows he is about to be sued would receive the same advice as a client who expressly believes he will never be sued (but seeks counsel to comply with the law). All advice thus includes analysis in the event of litigation—according to the district court—as part of the ordinary course of business. It therefore follows under the district court's decision that the work product doctrine virtually never applies to legal advice. A1759. This is not the law.

3. The District Court's Decision Would Have Broad Application To Virtually All Tax And Legal Advice And Directly Contradicts The Purpose Of The Work Product Doctrine.

Because all tax advisors, including accountants and attorneys, are subject to these professional and ethical standards, the district court's opinion would largely erase the work product doctrine in this Circuit. The district court's proposed new rule would punish any company that turns to its lawyers for litigation analyses that have a bearing on the company's financial dealings—a prudent and necessary course of action in any time, but particularly today.

The district court's rationale that a tax opinion that anticipates litigation is ordinary business advice not worthy of protection encourages practitioners either to (1) give no advice, or avoid recording their advice in written form for fear of discovery in later proceedings,[6] or (2) provide distorted advice and less-than-candid assessments of the potential outcomes, minimizing risks and overemphasizing positives. The D.C. Circuit recently voiced this concern from the client's perspective: allowing discovery of work product would "discourage companies from seeking legal advice and candidly disclosing . . . information" when required. *United States v. Deloitte LLP*, 610 F.3d 129, 143 (D.C. Cir. 2010). Neither result is acceptable to taxpayers who use the advice to evaluate potential reporting positions on their returns; to the

[6] As Judge Torruella warned in *Textron*, "if attorneys who identify good faith questions and uncertainties in their clients' tax returns know that putting such information in writing will result in discovery by the IRS, they will be more likely to avoid putting it in writing." *United States v. Textron, Inc.*, 577 F.3d 21, 36-37 (1st Cir. 2009) (Torruella, J., dissenting).

IRS who relies on accurate self-reporting and may ultimately examine the returns for correctness; or to the adversarial system.

### C. The District Court Errs By Requiring Schaeffler To Satisfy The Fifth Circuit's "Primarily To Assist In Litigation" Test, Which This Court Has Rejected.

The district court applies a two-step reasoning that effectively adopts the Fifth Circuit's outlier approach to work product:

1. Attorneys and tax advisors are ethically bound to provide the same advice to clients regardless of whether or not anyone anticipates litigation.

2. Because the advice would therefore be "created in substantially similar form" without anticipation of litigation, virtually all legal and tax advice concerning transactions and other business dealings—regardless of whether litigation is anticipated—falls outside the work-product protection.

Under this rationale, the only documents that could conceivably still be protected as work product would be those documents created expressly to assist in or for use in litigation. All other documents would fall into the district court's expansive definition of the "ordinary course of business." The district court thus contorts this Court's "because of" test for work product into the Fifth Circuit's "primarily to assist in litigation" test, which this Court and seven other courts of appeals have rejected.[7]

---

[7] *See*, *e.g.*, *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998); *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993); *Nat'l Union Fire Ins. Co. of Pittsburg v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992); *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006); *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118-19 (7th Cir. 1983); *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987); *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004). Moreover,

1.    This Court Already Considered And Rejected The Fifth Circuit's "Primarily To Assist In Litigation" Test.

In *Adlman*, this Court considered both the restrictive "primarily to assist in litigation" test applied by the Fifth Circuit and the "prepared because of litigation" test applied by most other circuits.  As explained in *Adlman*, the Fifth Circuit employs a test for work product requiring documents to be either prepared for use in imminent litigation or created with a "primary motivating purpose" of assisting with possible future litigation.  134 F.3d at 1198; *see also In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000).  This Court emphatically rejected that approach as being "at odds with the text and the policies" of Federal Rule of Civil Procedure 26(b)(3):  "Nowhere does Rule 26(b)(3) state that a document must have been prepared *to aid* in the conduct of litigation in order to constitute work product, much less *primarily or exclusively* to aid in litigation.  Preparing a document 'in anticipation of litigation' is sufficient."  *Adlman*, 134 F.3d at 1198 (emphasis in original).

This Court also observed that policies animating the work product doctrine "suggest strongly that work-product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business

---

that standard originated in the leading treatise on civil procedure, which states that, for purposes of the "in anticipation of litigation" requirement, "the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  *See* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024, at 343 (2d ed. 1994).

decision." *Id.* at 1199. The Fifth Circuit's approach would threaten to "deny protection to documents that implicate key concerns underlying the work-product doctrine" by revealing "the attorneys' most intimate strategies and assessments concerning the litigation." *Id.* at 1199, 1200.

2. The District Court Silently Adopts The Fifth Circuit Test.

Despite purporting to follow *Adlman*, the district court applies a version of the Fifth Circuit's litigation-specific standard without acknowledging that it is doing so. Anticipating litigation is not only a question of formulating a procedural strategy or a settlement position because every case is "about" something other than litigation procedures. The district court agrees that Schaeffler anticipated litigation and that the disputed documents analyze potential arguments and outcomes in litigation. Specifically, the district court agrees that the 321-page memorandum:

- "considers at great length the arguments and counter-arguments that could be made by Schaeffler and the IRS with regard to the appropriate tax treatment";
- "may be characterized as providing an 'opinion of the risks and probable outcome of litigation or other adversarial proceedings against the IRS in relation to the 2009 and 2010 refinancing and reorganization.'";
- "weighs the chances of success in court for certain tax positions"; and
- "contains phrases such as 'the [IRS] may argue that' or 'if the IRS were to assert.'"

A1754, 1758-59. Despite the obvious litigation focus, however, the district court withholds work-product protection because "the memorandum does not specifically

refer to litigation," otherwise discuss "actions peculiar to the litigation process [that] Schaeffler or the IRS might take or what settlement strategies might be considered," or describe "any particular anticipated litigation." A1754, 1759.

It is not clear from the district court's opinion what it is referring to as "actions peculiar to the litigation process" or what sort of "actions" would need to be discussed in order to trigger work product protection. A1754. But given that the district court acknowledges that the document "contains detailed and thorough legal analysis" as to the substantive issues that would likely be litigated, including potential arguments, counter-arguments, and outcomes, one can only presume that the district court is looking for procedural elements. *Id.* For example, that Schaeffler will seek depositions of certain witnesses, move for summary judgment on certain issues, or settle for a certain amount. In other words, litigation *analysis* containing attorneys' and advisors' "most intimate strategies and assessments concerning the litigation," *see Adlman*, 134 F.3d at 1200, is apparently not enough. Instead, to receive work-product protection, the district court demands that the documents function as a technical playbook for the subsequent litigation. This is, at a minimum, the "primarily to assist in litigation" test, which this Court already rejected and, in fact, may exceed that test.[8]

[8] The district court's application of the "primarily to assist in litigation" test is further confirmed by its reasoning that it is an "unstated premise" of Schaeffler's argument that Schaeffler only sought the advice "to prepare for litigation." A1755; *supra* Section I(A)(2).

The district court's criticism that the memorandum does not describe any "particular anticipated litigation" is also misplaced. A1759. Unlike many commercial or tort cases, there is always a "particular anticipated litigation" for a taxpayer in a tax dispute: while the specific adjustments may be unknown, the taxpayer is generally well aware of what tax year, what tax return, and what opponent (the IRS or DOJ) they will face, as well as the statutes of limitations on assessment and collection that may apply. Thus, Schaeffler could not have had a generalized, nonspecific fear of a tax dispute. The district court is raising a straw man.

The district court's reliance on the fact that the Ernst & Young memorandum did not discuss "actions peculiar to the litigation process" or unnecessarily spell out that the litigation would be with the IRS concerning the 2009 and 2010 tax returns—while placing no weight on the memorandum's detailed legal analysis—elevates form above substance and results in a test even more restrictive than that of the Fifth Circuit. A1754. While the Fifth Circuit requires documents be created *for* litigation, that test does not distinguish between substantive and procedural preparation. *See*, *e.g.*, *In re Kaiser Aluminum*, 214 F.3d at 593. Accordingly, documents such as the Ernst & Young memorandum and the other documents the IRS seeks could satisfy the Fifth Circuit's test because they contain substantive legal analysis that can be applied in later briefing and argument. They provide a substantive roadmap for litigation. Yet the same documents would fail the district court's test because they lack specific

references to procedural elements such as summary judgment or discovery. Such a test is inconsistent with Rule 26(b)(3) and this Court's precedent.

### D. Under The Correct Standard, The Documents At Issue Contain Quintessential Opinion Work Product And Are Protected From Disclosure.

Under the correct standard, there is no question that the disputed documents are work product. Indeed, as documents created in anticipation of litigation that show the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative," FED. R. CIV. P. 26(b)(3)(B), they fall within what this Court describes as "the most protected category of work product." *See Adlman*, 134 F.3d at 1204.

The Supreme Court and this Court have made clear that opinion work product reflecting mental impressions and analysis is subject to heightened protection and a substantial showing of need. *See Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981) (cautioning that discovery of opinion work product is "particularly disfavored"); *Hickman*, 329 U.S. at 513 (cautioning that discovery of this material is only warranted in "rare situation[s]"). Protection of this material does not conflict with Federal Rule of Civil Procedure 26's policy of liberal discovery because that discovery is aimed at facts, whereas opinion work is not primarily factual. *See Hickman*, 329 U.S. at 506, 507 ("[T]he deposition-discovery portions of the Federal Rules of Civil Procedure are designed to enable the parties to discover the true facts" and "[m]utual knowledge of

all the relevant facts gathered by both parties is essential to proper litigation."). To the contrary, as the Restatement observes, "opinion work product can almost always be duplicated through the efforts of the requesting party's lawyer or other representative." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 138 cmt. b (1993).

The IRS is not seeking facts here. Instead, the Summons expressly demands the "legal opinions, analysis and appraisals" of Schaeffler's tax advisors. A46. Given that Schaeffler has already produced dozens of Ernst & Young appraisals and valuations, the Summons is targeting legal opinions and analysis. In other words, core work product. The representative 321-page document reviewed by the district court confirms this fact, containing lengthy and detailed analysis of the potential tax consequences of the refinancing and restructuring, and identifying and analyzing possible IRS challenges to Schaeffler's tax positions. A1730. It analyzes the strengths and weaknesses of Schaeffler's tax and legal positions and the probable outcome of litigation against the IRS. *Id.* It further identifies issues as to which the law is unclear and indicates certain areas of risk that the transactions might be successfully challenged. A1754, 1758. In sum, it contains the most sensitive mental impressions and analysis of Schaeffler's advisors regarding anticipated litigation.

The IRS's attempt to obtain this analysis and opinion work is exactly the sort of conduct that the work product doctrine guards against. In a highly analogous case in which the IRS found itself on the other side of the work product argument—resisting

discovery of internal memoranda assessing legal challenges likely to be mounted against a proposed program—the D.C. Circuit explained why the pursuit of an adversary's analysis and opinions runs afoul of the work product doctrine:

> [P]laintiff here is not trying to ascertain the agency's view of the law in order to comply or to advise clients on how to comply; it is seeking the agency's attorneys' assessment of the program's legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case against the program. This is precisely the type of discovery the Court refused to permit in *Hickman v. Taylor*.

*Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987). Likewise, this Court noted in *Adlman* that "a study reflecting the company's litigation strategy and its assessment of its strengths and weaknesses cannot be turned over to litigation adversaries without serious prejudice to the company's prospects in the litigation." 134 F.3d at 1200. And as another court has observed, the "IRS would appear to obtain an unfair advantage by gaining access to [the tax advisor's] detailed legal analysis of the strengths and weaknesses of [the taxpayer's] position," contrary to the work product doctrine's very purpose. *United States v. Roxworthy,* 457 F.3d 590, 595 (6th Cir. 2006).

The IRS is not seeking to ascertain Schaeffler's views of the law, but rather, Schaeffler's assessment of its own legal vulnerabilities. The IRS, more pointedly, is seeking a roadmap to Schaeffler's defense and insight on how to defeat Schaeffler in litigation. But "[d]iscovery was hardly intended to enable a learned profession to

perform its functions either without wits or on wits borrowed from the adversary." *Hickman*, 329 U.S. at 516 (Jackson, J., concurring).

## II. The District Court Fails To Correctly Apply This Court's Standard For The Common Interest Doctrine.

The district court also holds that Schaeffler waived attorney-client privilege for the documents at issue by sharing them with the Bank Consortium because, according to the district court, the "common interest" doctrine did not apply to those communications. A1748.[9] In doing so, the district court elevates formalistic distinctions—whether the Bank Consortium could be "named as a co-defendant"—over substance—a significant common interest turning on the outcome of likely litigation, and runs afoul of this Court's precedent.

### A. The District Court Applies A Bright-Line Test That Does Not Exist Under This Court's Precedent.

The district court applies a minority approach to the common interest doctrine—effectively requiring a showing that the parties could be "co-parties to litigation"—that this Court has not adopted:

[9] Since the federally-authorized tax practitioner privilege under I.R.C. § 7525 is functionally "coterminous" with the attorney-client privilege, Schaeffler discusses the two privileges jointly and interchangeably herein. *See* I.R.C. § 7525(a)(1) ("[T]he same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner."); A1737-38 (recognizing that privileges are "essentially 'coterminous'").

> [A] common legal interest has been defined as one in which the parties have been, or may potentially become, co-parties to a litigation . . . or have formed a coordinated legal strategy.
>
> . . . .
>
> The classic situation where parties share a common legal interest is where they are or may "potentially become, co-parties to a litigation."
>
> . . . .
>
> What is lacking is any common legal stake in Schaeffler's putative litigation with the IRS. *If the Bank Consortium could have been named as a co-defendant in the anticipated dispute with the IRS, the result would undoubtedly be different.*

A1741, 1743, 1746 (emphasis added) (quotations omitted). Thus, for the district court, the existence of a common legal interest turns entirely—and wrongly—on whether the Bank Consortium could be a co-party to litigation with the IRS: "the result would undoubtedly be different," and the common interest doctrine would be triggered if the co-party test were met. *See* A1746. This is contrary's to this Court's precedent.

The controlling case for the common legal interest doctrine is *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989). In that case, a criminal defendant shared confidential information with an accountant hired as a litigation consultant by counsel for a co-defendant, where the two defendants and their counsel had agreed to coordinate a mutual legal defense strategy. *Id.* at 241. In recognizing that the information at issue was potentially privileged, this Court made clear that the "common interest" doctrine

> serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.

*Id.* at 243 (citations omitted).  The Court also made clear that sharing "a common interest about a legal matter" is sufficient to invoke the doctrine and that there does *not* need to be actual, pending litigation:

> The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter, and *it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply* . . . .

*Id.* at 243-44 (emphasis added) (citations and quotations omitted).

As indicated in *Schwimmer*, the common interest doctrine applies when the communication at issue meets the other requirements of attorney-client privilege, namely, "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."  *Id.* at 244; *see also In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).  In determining the purpose of a potentially privileged communication, this Court considers "whether the *predominant* purpose of the communication is to render or solicit legal advice."  473 F.3d. at 420 (emphasis added).  If so, the requirement is met.

While the district court makes passing reference to *Schwimmer*, it instead relies on a selection of district court authorities, including *In re Subpoena Duces Tecum Served on*

*New York Marine and General Insurance Co.*, No. M 8-85 MHD, 1997 WL 599399 (S.D.N.Y. Sept. 26, 1997). But this Court has not adopted many of the common interest formulations recited in the district court's decision. Those authorities—at least as applied by the district court here—conflict with *Schwimmer* and other Second Circuit authority regarding attorney-client privilege.

1. The District Court's Improper Focus On "Co-Parties To Litigation" Drove Its Erroneous Determination That Schaeffler And The Banks Lacked A Common Legal Interest.

The district court's analysis of the common interest between Schaeffler and the Bank Consortium relies on the faulty premise that the common interest doctrine only applies in cases involving co-parties, identically aligned, with solely a litigation-driven interest. For example, the district court dismisses the authorities offered by Schaeffler in support of a common legal interest as inapposite because "the parties who shared the privileged information were in essentially the same legal position vis-à-vis the IRS as the entities who received the information. Here by contrast, Schaeffler and the Bank Consortium stood in very different positions vis-à-vis the IRS." A1744. But this Court does not require a complete identity of interest. Nor does it even require a similar procedural stance. Instead, *Schwimmer* only requires that the parties engage in a "joint defense effort or strategy" and a "ongoing common enterprise." 892 F.2d at 243. *Schwimmer* expressly rejects the notion that the common interest must be tied to "actual litigation in progress." *Id.* at 244.

The district court also cites numerous other lower court cases for the proposition that the parties' "shared desire to succeed in an action" is insufficient to create a common legal interest. A1744-45. This analysis also does not exist in this Court's controlling precedent. To the contrary, a shared desire to succeed in litigation is logically a central component of any "joint defense effort or strategy." Notably, the district court also cites to cases correctly holding that a common legal interest exists where there is a "coordinated legal strategy," as in *Schwimmer*. *See* A1741, 1744-46. The district court erroneously reasons, however, that a coordinated legal strategy is insufficient if the parties share solely a common commercial interest. *See* A1746.

The district court's decision thus creates a strict, bright-line test of whether Schaeffler and the Bank Consortium could be "co-parties to litigation." The district court then finds that the parties fail that test because "only the Consortium's economic interests were in jeopardy" and because the "Bank Consortium could [not] have been named as a co-defendant" in a potential dispute with the IRS. A1746.

2. <u>"Co-Parties to Litigation" Is Not This Court's Standard, Nor Should It Be.</u>

The district court strays from this Court's precedent and employs a standard similar to that used in the outlier Fifth Circuit. Under the Fifth Circuit's approach, the common interest doctrine is available only in cases involving a "palpable threat of litigation at the time of the communication." *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 711 (5th Cir. 2001). Accordingly, "a cognizable common legal interest does not exist

if a group of individuals seeks legal counsel to avoid conduct that might lead to litigation, but rather only if they request advice to 'prepar[e] for future litigation.'" *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) (quoting *Santa Fe*, 272 F.3d at 713).

The majority of the other circuits to consider this issue have rejected the Fifth Circuit's narrow view of the common interest doctrine.[10] Indeed, this Court in *Schwimmer* expressly rejected the notion that the common interest doctrine was litigation-driven: "[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter, and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply." 892 F.2d at 243-44 (citations and quotations omitted).

This Court's broad view of the common interest doctrine as an exception to waiver of attorney-client privilege is based on sound policy. The need for protection of the confidentiality of legal advice shared between represented parties far exceeds the litigation setting: a litigation-based test, as noted by the Federal Circuit, runs contrary to the "'established [rule] that the attorney-client privilege is not limited to

[10] In addition to the Court, the First, Fourth, Seventh, Ninth, and Federal Circuits have rejected the Fifth Circuit's standard. *See United States v. BDO Seidman, LLP,* 492 F.3d 806, 816 n.6 (7th Cir. 2007)*; In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001); *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1390-91 (Fed. Cir. 1996); *United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996); *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987), *aff'd in part and vacated in part on other grounds*, 491 U.S. 554 (1989).

actions taken and advice obtained in the shadow of litigation.'" *See In re Regents of Univ. of Cal.*, 101 F.3d at 1390. As another court observed, "[b]y refusing to find waiver in these settings courts create an environment in which businesses can share more freely information that is relevant to their transactions." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 115 F.R.D. 308, 311 (N.D. Cal. 1987).

**B. The Bank Consortium's Interest In The Resolution Of Schaeffler's Tax Dispute Was A Common Legal Interest.**

The district court discounts the Bank Consortium's interest in the resolution of Schaeffler's tax liabilities as a mere economic interest. But in the vast majority of commercial litigation, interests are always economic. An interest can be both economic and legal: the test for common legal interest is not, as the lower court has formulated it, an either/or proposition. And indeed, this "mere" economic interest was extraordinary—over $1.3 billion in credit exposure for the Bank Consortium overall—and the Bank Consortium's interest expressly turned on the outcome of ongoing administrative examinations and prospective litigation with the IRS.

1. <u>The Bank Consortium Had An "Enormous Stake"—And A Legal Interest—In The Outcome Of Schaeffler's Federal Tax Dispute.</u>

Schaeffler established, based on undisputed evidence, that the Bank Consortium shared a joint legal strategy with Schaeffler in resolving Schaeffler's federal tax liabilities. Although the district court concluded that it had "no doubt that the Bank Consortium had an enormous stake in the tax consequences of Schaeffler's refinancing and restructuring decisions" (A1743), the district court erred in

concluding that "[w]hat is lacking is any common legal stake in Schaeffler's putative litigation with the IRS." *See* A1746.

Schaeffler's restructuring and concomitant refinancing of debt with the Bank Consortium took place during a global financial crisis—and a crisis for Schaeffler and the Bank Consortium specifically.  Schaeffler's tender offer for Conti had been critically oversubscribed, causing Schaeffler to acquire a much larger share of Conti than anticipated, and causing the Bank Consortium to lend a much larger amount than expected.  Schaeffler and the Bank Consortium jointly agreed to implement a refinancing and restructuring plan because both sides knew they were at significant financial risk.  A46-77, 104, 1732-33.  As Schaeffler's tax counsel described it:

> Schaeffler and the Bank Consortium worked together to refinance Schaeffler's debt obligations in order to prevent: a default; a successful IRS challenge and potentially substantial U.S. tax adjustments; and the consequential potential insolvency of all parties. It was clear to me that the U.S. tax implications would shape the refinancing.

A104.  Thus, the tax issues were intimately tied to success of the restructuring and refinancing as a whole:  getting the tax issues wrong, resulting in significant IRS adjustments, could be disastrous to the deal itself, to Schaeffler, or the Bank Consortium.

As counsel for the Bank Consortium recalled, the Bank Consortium fully appreciated the complexity and magnitude of the U.S. tax issues (A76-77)—so much so that the Bank Consortium effectively subordinated its own claims for debt repayment to the resolution of Schaeffler's U.S. tax liabilities.  A77.  The district court

mentioned this agreement (the "Ringfencing provisions"), but ignored its legal consequences:

> The Ringfencing provisions allowed Schaeffler to prioritize up to €885 million of his personal tax liabilities over repayment of the debt owed to the Bank Consortium. The Bank Consortium also agreed to provide an additional line of credit to pay Schaeffler's tax liabilities up to €250 million. The Ringfencing provisions required "Schaeffler to notify the Bank Consortium of a material audit or investigation" by the IRS and to "permit the Bank Consortium the opportunity to advise on any proposed action—including contesting or settling the tax dispute—before proceeding."

*See* A1733. The interests the court describes are sufficient to trigger the common legal interest doctrine and prevent waiver of attorney-client privilege.

The Ringfencing provisions, however, were actually significantly *stronger* than the district court acknowledges. Given more than just an "opportunity to advise" on audit issues, the Bank Consortium had effective veto power over settlement or resolution of any significant dispute between Schaeffler and the IRS:

> [Schaeffler] undertake[s] and shall procure that in respect of any item covered by a Tax audit or investigation that may result, that in the reasonable belief of [Mr. Schaeffler], in [an individual] Tax Payment in excess of EUR 10,000,000, *no material decisions regarding the item, including a decision to pay the Tax and pursue a refund, or to acknowledge or settle any such contested Tax, shall be taken without the prior written consent of the [Bank Consortium]*, such consent not to be unreasonably withheld or delayed.

A88, 98 (emphasis added).[11]

[11] The provision is identical in both agreements; the terminology of the agreements has been conformed to match that used in this Brief and the Order. *See also* A80 (defining "Agent"), A82 (defining "Shareholder" and "Shareholder Tax Payment").

Thus, in setting up an unnecessary dichotomy between legal and commercial interests under the common interest doctrine, the district court disregards key evidence demonstrating that the Bank Consortium actually had a substantial legal interest in the outcome of the IRS dispute: the Bank Consortium had the power to decide when to pay, when to file a refund claim, and when to settle—all of which impacted the priority or subordination of the Bank Consortium's debt and are key legal components of Schaeffler's ongoing dispute with the IRS.

2. The District Court's Formulation Needlessly Restricts the Common Interest Doctrine and Ignores the Realities of Commercial Litigation.

Under the district court's logic, a party that agrees to fully indemnify another party in litigation would not have a common legal interest in the litigation because indemnification would only be an economic matter for the indemnitor. That is not the law. The common legal interest sufficient to avoid waiver need not be complex, and can simply be a common desire to comply with applicable laws or to reduce or avoid litigation. *See*, *e.g.*, *BDO Seidman*, 492 F.3d at 816 (upholding lower court decision that "joint venturers shared a common legal interest 'in ensuring compliance with the new regulation issued by the IRS,' and in making sure that they could defend their product against potential IRS enforcement actions.") (citation omitted); *In re Regents of Univ. of Cal.*, 101 F.3d at 1390-91 (applying common-interest privilege to patent prosecution context after observing that public interest is served by

encouraging "compliance with law and meeting legal requirements"); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 417 (N.D. Ill. 2006) (concluding that parties shared both common business interest and "a common legal interest regarding compliance with antitrust and other laws").

In fact, contractual interests like those shared between Schaeffler and the Bank Consortium clearly qualify as common legal interests: "While the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies." *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 72-73 (S.D.N.Y. 2009) (holding common interest exception applied to communications regarding strategy between litigant and five non-party lenders in action to enforce loan guaranties).

Moreover, numerous federal courts have recognized that an insurer shares a common legal interest with the insured in the outcome of litigation, even when the insurer is not a party to the litigation and solely has an interest in funding the defense or in the potential ultimate liability subject to litigation. For example, in *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 571-73 (E.D. Cal. 2002), an insurance company was paying at least part of the insured party's defense costs under a reservation of rights. The documents at issue were shared pursuant to a "cooperation clause" in the insurance policy. *Id.* at 569. Under these circumstances, the court found that a common interest existed, and the documents were protected

from disclosure. *Id.* at 573; *see also Travelers Cas. & Sur. Co. v. Excess Ins.*, 197 F.R.D. 601, 607 (S.D. Ohio 2000) (holding that communications among joint defense group of reinsurers facing similar pollution-related claims were privileged even though reinsurers were not parties to same litigation and did not have "an absolute congruence" of potential defenses in litigation); *Minn. Sch. Bds. Ass'n Ins. Trust v. Emp'rs Ins. Co. of Wausau*, 183 F.R.D. 627, 631-32 (N.D. Ill. 1999) (concluding that common interest existed between insurance company and its reinsurers in "evaluating and minimizing [their] exposure" arising out of litigation and where insurer intended and expected communications between parties to remain confidential and "protected from common adversaries").

Federal courts have also repeatedly recognized that entities whose sole interest in a case is to fund the litigation (e.g., commercial claim funders or patent monetization consultants) can be subject to the common legal interest exception to waiver. *See*, *e.g.*, Memorandum Order at 2, *Walker Digital, LLC v. Google, Inc.*, No. 1:11-309-SLR (D. Del. Feb. 12, 2013) (holding privileged communications between patent monetization consultant, who was funding litigation, and plaintiff claim holder); *High Point SARL v. Sprint Nextel Corp.*, No. 09-2269-CM-DJW, 2012 U.S. Dist. LEXIS 8435, at *34-35 (D. Kan. Jan. 25, 2012) (holding patent claimant could establish common interest exception for documents shared with potential buyers of claim, if other elements of attorney-client privilege were met).

Thus, the district court's narrow construction of the legal interest sufficient to trigger the common interest exception to waiver of attorney-client privilege functionally ignores the substantial contractual rights that exist between many types of parties and non-parties to civil litigation. By focusing on a "coordinated legal strategy" rather than the formal relationship between the parties, this Court in *Schwimmer* allowed for a much broader range of common interests to be protected under the exception, in keeping with commercial realities.

3. The District Court Erroneously Distinguishes Case Law—Including Its Own—Indicating That An Interest In A Tax Dispute Is A Common Legal Interest.

To reach the dubious conclusion that Schaeffler and the Bank Consortium did not share a common legal interest, Magistrate Judge Gorenstein sidesteps a range of cases—including his own prior opinion—signaling that an interest in the outcome of a tax dispute is a common legal interest. *See* A1744-48.

In *Bank of America, N.A. v. Terra Nova Insurance Co.*, 211 F. Supp. 2d 493, 497-98 (S.D.N.Y. 2002), Magistrate Judge Gorenstein held that a common legal interest did not exist for "communications with [a non-party debtor] and/or its counsel with respect to the structuring and effectuation of the letter of credit agreement and the supporting reinsurance policies[,]" where the parties to the communications did not share an identical legal interest. In finding no common legal interest there, the judge offered the example of "avoidance of tax liability" as an instance where the parties

*would* share a common legal interest. *Id.* at 498 (citing *United States v. United Techs. Corp.*, 979 F. Supp. 108 (D. Conn. 1997)).

In *United Technologies Corp.*, a consortium of companies planned to set up a jointly-owned company and shared documents addressing how to develop this structure to minimize the U.S. tax liability of all consortium members. 979 F. Supp. at 110. The court held that this was a common legal interest and that attorney-client privilege applied to the documents even though they had been shared among the consortium:

> [I]n the area of taxation, it is often difficult to determine where business ends and the law begins, the court finds that nearly all the documents pertain to the development of a common legal strategy regarding the tax structure of [the company]. In formulating this strategy, the members acted not as adversaries negotiating at arms length but as collaborators, legally committed to a cooperative venture and seeking to make that venture maximally profitable.

*Id.* at 112.

To distinguish this case law, the district court relies on its invented bright-line test, emphasizing that these cases were different because each party's own tax liabilities were at issue and each could have been a co-party to litigation with the IRS: the parties in the cases were "in essentially the same legal position vis-à-vis the IRS." A1744. "If the Bank Consortium could have been named as a co-defendant in the anticipated dispute with the IRS, the result would undoubtedly be different." A1746.

### C. Applying This Court's "Coordinated Strategy" Test, Communications Between Schaeffler And The Bank Consortium Remain Privileged.

If the Court views the present case through the lens of its controlling authority, *Schwimmer* and *County of Erie*, it is clear that Schaeffler and the Bank Consortium shared a common legal interest in resolving Schaeffler's federal income tax liabilities without significant IRS adjustments.

While the Bank Consortium is not under audit, the Bank Consortium and Schaeffler shared a common legal interest at the time of the creation of the summonsed documents by virtue of the Ringfencing provisions. *See, e.g., In re Reserve Fund Sec. & Derivative Litig.*, Nos. 09-MD.2011 (PGG), 09 Civ.4346 (PGG), 2012 U.S. Dist. LEXIS 147723, at *31 (S.D.N.Y. Sept. 12, 2012) ("'[T]he common interest rule is concerned with the relationship between the transferor and the transferee at the time that the confidential information is disclosed.'") (citation omitted). The Bank Consortium would have played a key role in the pending dispute by effectively funding Schaeffler's potential tax liability in an amount exceeding $1.3 billion, by subordinating its claim, coordinating and advising upon overall strategy, and by exercising the power to consent to major decisions in the proceedings like payment, filing suit for refund, or settlement. The Bank Consortium plainly had a substantial economic interest in the outcome of this dispute, but the Bank Consortium's interest in the dispute was predominantly legal: what is the proper interpretation of the

Internal Revenue Code, Treasury Regulations, and IRS guidance as applied to Schaeffler's returns?

If Schaeffler and the Bank Consortium interpreted those rules incorrectly, those errors would have triggered the Bank Consortium's credit exposure under their agreements. Schaeffler and the Bank Consortium agreed via contracts to apportion their economic risk based on the outcome of the IRS examination and litigation, and those same agreements afforded the Bank Consortium significant procedural rights regarding Schaeffler's ultimate federal tax liability. Thus, under *Schwimmer*, the communications at issue are protected because they were in furtherance of a "joint defense effort or strategy . . . decided upon and undertaken by the parties and their respective counsel." *See* 892 F.2d at 243.

Finally, Schaeffler and the Bank Consortium have otherwise established the elements of attorney-client privilege such that the common interest doctrine would apply. The communications at issue were made under an agreement to keep all matters privileged and confidential, were made for the primary purpose of seeking legal advice, and were made to attorneys and/or federally-authorized tax practitioners within the meaning of I.R.C. § 7525. Accordingly, under *County of Erie*, these communications remained privileged. *See* 473 F.3d at 419-20.

## CONCLUSION AND RELIEF SOUGHT

For the reasons set forth above, the Order of the district court denying Petitioners-Appellants' Petition to Quash should be reversed, and the case should be remanded with instruction to grant the Petition to Quash in its entirety. Petitioners-Appellants additionally request all such further legal and equitable relief to which they may be entitled.

Dated: September 5, 2014

Respectfully submitted,

/s/ M. Todd Welty
M. Todd Welty

M. Todd Welty
Mark P. Thomas
Laura G. Gavioli
Richard D. Salgado
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201-1858
Telephone: (214) 259-0900
Facsimile: (214) 259-0910
todd.welty@dentons.com
mark.thomas@dentons.com
laura.gavioli@dentons.com
richard.salgado@dentons.com

ATTORNEYS FOR PETITIONERS-APPELLANTS

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this Brief contains 13,490 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as counted by the Microsoft Word processing system used to produce this Brief.

I further certify that this Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this Brief has been prepared in a proportionally spaced typeface using Garamond in 14 points.

/s/ M. Todd Welty
M. Todd Welty
Attorney for Petitioners-Appellants
Dentons US LLP
Dated: September 5, 2014

# SPECIAL APPENDIX

## TABLE OF CONTENTS

| | Page |
|---|---|
| Opinion and Order of the Honorable Gabriel W. Gorenstein, dated May 28, 2014 Appealed From .. | SPA-1 |
| Order of the Honorable Gabriel W. Gorenstein, dated August 21, 2014 ........................................... | SPA-36 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

GEORG F. W. SCHAEFFLER et al., :

Petitioners, : OPINION AND ORDER

-v.- : 13 Civ. 4864 (GWG)

UNITED STATES OF AMERICA., :

Respondent. :

---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

Justin Kattan, M. Todd Welty, Mark P. Thomas, Dentons US LLP, New York, New York, for petitioners

Rebecca S. Tinio, Assistant United States Attorney, Preet Bharara, United States Attorney, New York, New York, for respondent.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GEORG F. W. SCHAEFFLER et al., :

Petitioners, : OPINION AND ORDER

-v.- : 13 Civ. 4864 (GWG)

UNITED STATES OF AMERICA., :

Respondent. :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

As part of its investigation into the federal tax liability of Georg F.W. Schaeffler, the Internal Revenue Service ("IRS") served an administrative summons on Schaeffler's accountant, Ernst & Young. Schaeffler, together with a number of entities he controls, have now petitioned to quash the summons on the ground that it calls for privileged materials The United States Government has opposed the petition. The parties consented to disposition of this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, we deny the petition to quash.

I. BACKGROUND

A. Schaeffler's Acquisition of Continental AG

Schaeffler owns 80% of INA-Holding Schaeffler GmbH & Co. KG ("IHO"), which is itself an indirect owner of Schaeffler Holding GmbH & Co. KG ("SH-KG"), and is also the sole owner of Schaeffler Holding, LP ("Schaeffler LP") (collectively the "Schaeffler Group"). See Declaration of Georg F. W. Schaeffler in Support of Schaeffler's Petition to Quash Summons, dated May 16, 2013 (annexed as Ex. B to Petition to Quash Internal Revenue Service Summons, filed July 12, 2013 (Docket # 1) ("Pet.")) ("Schaeffler Decl."), ¶ 4. The Schaeffler Group is

headquartered in Herzogenaurach, Germany, and is involved in the business of manufacturing and distributing bearings and other automotive and industrial components. Id.

On July 30, 2008, the Schaeffler Group made a tender offer to buy shares of Continental AG ("Conti"), a German supplier of automotive and industrial parts. Id. ¶¶ 5-6. The Schaeffler Group had expected to limit its acquisition to less than 50% of Conti's outstanding shares. Id. ¶ 6. However, as a result of the stock market downturn in September 2008, a majority of Conti shareholders accepted the tender offer for € 70-75 per share, and the Schaeffler Group ended up amassing 89.9% of Conti's outstanding shares. Id. The cost of this acquisition was € 11 billion. Id. ¶ 7. From August 27, 2008, to February 24, 2009, the market value of Conti shares plummeted from approximately € 74 to € 11. Id. ¶ 6.

The Schaeffler Group's acquisition was funded by a consortium of banks (the "Bank Consortium"), which had pledged to finance the Schaeffler tender offer pursuant to a July 12, 2008 loan agreement. Id. ¶ 7; Declaration of Klaus Rosenfeld in Support of Schaeffler's Petition to Quash Summons, dated May 16, 2013 (annexed as Ex. C to Pet.) ("Rosenfeld Decl."), ¶ 5. Given the unexpected result of the tender offer and the dire economic conditions at that time, the Schaeffler Group had "significant solvency concerns" about its ability to service the debt to the Bank Consortium. See Schaeffler Decl. ¶ 7. Accordingly, the Schaeffler Group recognized the need to undertake substantial debt refinancing and corporate restructuring measures. Id. ¶ 5; Rosenfeld Decl. ¶ 5.

B. Ernst & Young and Dentons' Representation of Schaeffler

Because the Schaeffler Group viewed the tax issues raised by the Conti acquisition and the planned refinancing and restructuring to be unusually complex, it did not use its internal tax department but instead hired outside tax and legal advisors at Dentons US LLP ("Dentons") and

Ernst & Young LLP.  Schaeffler Decl. ¶ 10; Rosenfeld Decl. ¶ 9; Declaration of Harald Dewert

in Support of Schaeffler's Petition to Quash Summons, dated May 13, 2013 (annexed as Ex. D to

Pet.) ("Dewert Decl."), ¶ 6.  Schaeffler's corporate lawyers at Allen & Overy also advised the

Schaeffler Group regarding these issues.  Schaeffler Decl. ¶ 11.  Ernst & Young provided tax

advice "on the various U.S. tax implications of the Schaeffler Group's proposed refinancing and

restructuring related to the unanticipated consequences resulting from the Schaeffler Group's

acquisition of Continental AG."  Declaration of John Martinkat in Support of Schaeffler's

Petition to Quash Summons, dated May 16, 2013 (annexed as Ex. F to Pet.) ("Martinkat Decl."),

¶ 3.  Specifically, "EY prepared tax memoranda and other tax analysis that identified potential

U.S. tax consequences of the refinancing and restructuring, and identified and analyzed possible

IRS challenges to the Schaeffler Group's tax treatment of the transactions at issue."  Id. ¶ 4.

John Martinkat, a partner at Ernst & Young, describes one such document, which we will refer

to as the "EY Tax Memo."  He states that this memorandum contained "EY's analysis and

advice concerning the U.S. federal tax treatment of various aspects of the Schaeffler Group's

2009 and 2010 restructuring and refinancing, including an analysis of the possible challenges by

the IRS [discussing] in detail the statutory provisions, Treasury regulations, judicial decisions,

and IRS rulings relevant to various aspects of the transactions."  Id. ¶ 8.  The Court has

examined this document in camera as is discussed in section II.B.3 below.

Dentons similarly "provided Schaeffler with U.S. tax and legal advice . . . in oral and

written form, to assist Schaeffler in evaluating the likely tax consequences of the refinancing and

restructuring, to assess the arguments the IRS would likely make in any dispute of Schaeffler's

tax treatment of the transactions, and to weigh the potential risks Schaeffler would face if the tax

consequences of the transactions were litigated or otherwise challenged by the IRS."


Declaration of Marc Teitelbaum in Support of Schaeffler's Petition to Quash Summons, dated

May 17, 2013 (annexed as Ex. H to Pet.) ("Teitelbaum Decl."), ¶ 12.  Specifically, Dentons gave

legal advice on the following issues: "controlled foreign corporation ('CFC') U.S. tax principles;

significant troubled company issues; German bank regulatory issues; the Conti debt covenant

restrictions; German creditors' rights, securities, and merger and acquisition laws; and the

differences between U.S. and German legal forms and tax law."  Id. ¶ 6.

Schaeffler sought the outside tax and legal advisors at Ernst & Young and Dentons

because he believed that "(1) acquiring an indirect majority ownership interest in Conti, a large

non-U.S. corporation, and (2) the obviously necessary refinancing of the Conti stock acquisition

debt and associated corporate restructuring would have significant U.S. tax and reporting

implications."  Schaeffler Decl. ¶ 8.  Furthermore, "[d]ue to the magnitude of the restructuring,

the complexity of the U.S. tax issues, and the material amounts potentially at issue, [Schaeffler]

expected, from the earliest planning stages of the refinancing and restructuring, that an IRS audit

and possible dispute over at least some of the tax consequences was very likely, if not

inevitable."  Id. ¶ 19. This view was shared by his employees, see Dewert Decl. ¶ 8; Declaration

of Klaus Deissenberger in Support of Schaeffler's Petition to Quash Summons, dated May 14,

2013 (annexed as Ex. E to Pet.), ¶ 7, and his tax and legal advisors, see Martinkat Decl. ¶ 7;

Teitelbaum Decl. ¶ 11.

Schaeffler asserts that "[b]ut for" this expectation that the refinancing and restructuring

measures would have "significant U.S. tax and reporting implications" and that the IRS would

"examine these events closely," neither Dentons nor Ernst & Young "would have been engaged"

for their services.  Schaeffler Decl. ¶¶ 8, 10.  Schaeffler's belief that the IRS would challenge his

2009 and 2010 tax returns was reinforced by the fact that he had recently been subjected to IRS

audits. See Schaeffler Decl. ¶ 25. Schaeffler's 2001 and 2004 amended U.S. federal income tax returns had been examined by the IRS in the 2007-08 time period. Id.; accord Declaration of M. Todd Welty in Support of Schaeffler's Petition to Quash Summons, dated July 7, 2013 (annexed as Ex. I to Pet.) ("Welty Decl."), ¶ 5. In 2009, the IRS began examinations of Schaeffler's 2006, 2007, and 2008 returns. Schaeffler Decl. ¶ 25. Schaeffler believed that "audits of [his] 2009 and 2010 tax returns were essentially inevitable." Id.

Throughout 2008 and 2009, Dentons and Ernst & Young tax and legal advisors worked together with the Schaeffler Group both to "devise a viable debt refinancing and restructuring" plan, Teitelbaum Decl. ¶ 8, and to evaluate the likely tax implications of such measures, id. ¶¶ 9-13. Schaeffler treated the communications with Dentons and Ernst & Young as "confidential." See id. ¶ 15; see also Rosenfeld Decl. ¶ 10; Dewert Decl. ¶ 9. The advisors at Dentons and Ernst & Young have also asserted that they maintained the confidentiality of these communications. See Martinkat Decl. ¶ 12; Teitelbaum Decl. ¶ 12. Eventually, "[d]ue to the magnitude and complexity of the issues . . . and because of the anticipated audit and the potential controversy with the IRS," Schaeffler sought a private letter ruling from the IRS. Teitelbaum Decl. ¶ 14; see generally 26 C.F.R. § 601.201. On August 6, 2010, the IRS ruled in favor of Schaeffler's proposed core tax treatment of the refinancing and restructuring measures. See Welty Decl. ¶ 8.

C. Communications Between Schaeffler and the Bank Consortium

By all accounts, the Schaeffler Group, Ernst & Young, and Dentons worked closely with the Bank Consortium not only in effectuating the refinancing and restructuring but also in analyzing the tax consequences of the Conti acquisition. The Bank Consortium was represented by Linklaters LLP. See Declaration of Stephen B. Land in Support of Schaeffler's Petition to Quash Summons, dated May 17, 2013 (annexed as Ex. G to Pet.) ("Land Decl."), ¶ 4. Stephen

Land, a Linklaters partner who worked on the assignment, explained that the Bank Consortium "was concerned about the U.S. tax implications of any debt refinancing and restructuring plan, since the resulting tax consequences could materially affect the Schaeffler Group's net cash flow and assets that would otherwise be available to repay the [Consortium's] debt." Id. ¶ 5. Early in the refinancing negotiations, Schaeffler and the Bank Consortium reached an agreement, which they have referred to as the "Ringfencing provisions," under which the Bank Consortium subordinated its claims for repayment of Schaeffler's debt to the payment of Schaeffler's personal tax liabilities. See Teitelbaum Decl. ¶ 16; Schaeffler Decl. ¶ 13. The Ringfencing provisions allowed Schaeffler to prioritize up to € 885 million of his personal tax liabilities over repayment of the debt owed to the Bank Consortium. Rosenfeld Decl. ¶ 8. The Bank Consortium also agreed to provide an additional line of credit to pay Schaeffler's tax liabilities up to € 250 million. Teitelbaum Decl. ¶ 19. The Ringfencing provisions required "Schaeffler to notify the Bank Consortium of a material audit or investigation" by the IRS and to "permit the Bank Consortium the opportunity to advise on any proposed action — including contesting or settling the tax dispute — before proceeding." Schaeffler Decl. ¶ 14.

The Schaeffler Group and the Bank Consortium agreed to share legal analyses addressing the potential tax implications regarding the restructuring and refinancing measures. Rosenfeld Decl. ¶ 12. To this end, they signed an agreement, referred to as the Attorney Client Privilege ("ACP") Agreement, in which they expressed their desire to "share privileged, protected, and confidential documents and their analyses without waiving those privileges, protections, or the confidentiality of the information." Id. ¶¶ 12-13. Rosenfeld states that "the ACP Agreement was an important prerequisite for sharing the tax advice with the Bank Consortium," id. ¶ 15, and that he has "no reason to believe that the parties to the ACP Agreement, in fact, have not


maintained through the present time, the confidentiality of all information shared pursuant to the ACP Agreement," id. ¶ 16.  Although the ACP Agreement has not been made part of the record, Teitelbaum asserts that it "provides that information exchanged or otherwise communicated pursuant to the ACP Agreement that is protected from disclosure by U.S. privileges or protection, including, but not limited to, the attorney-client privilege, work-product doctrine, and the tax practitioner privilege of I.R.C. § 7525, will remain privileged and protected under the common legal interest doctrine, joint defense doctrine, or other available privileges and protections."  Teitelbaum Decl. ¶ 22.

Following execution of the ACP Agreement, the Schaeffler Group shared with the Bank Consortium certain documents containing tax advice.  See Land Decl. ¶ 9; Teitelbaum Decl. ¶ 21.  It is these documents, which were created by Ernst & Young and disclosed by Schaeffler to outside parties, that the Government has asked Ernst & Young to produce.  See IRS Summons to Ernst & Young, dated June 25, 2013 (annexed as Ex. A to Pet.) ("IRS Summons").  Out of the approximately 10,000 responsive Ernst & Young documents, petitioners have described only the EY Tax Memo, which they allege analyzed "numerous legal issues, cases, and tax authorities, discusse[d] theories the IRS may advance to challenge the transactions, and note[d] the strengths and weaknesses of Schaeffer's tax and legal positions."  Teitelbaum Decl. ¶ 23.

D.    The IRS Audit of Schaeffler's 2009 and 2010 Tax Returns

Notwithstanding the IRS's private letter ruling in 2010 approving Schaeffler's proposed core tax treatment of the restructuring and refinancing measures, see Welty Decl. ¶ 8, the IRS began to examine Schaeffler's 2009 and 2010 federal income tax returns in 2012, id. ¶ 11.  On July 26, 2012, the IRS sent Schaeffler a letter stating it intended to audit Schaeffler's personal tax returns as well as the Schaeffler Group's returns for the 2009 and 2010 taxable years.  Id.

Official audit notices were then sent to Schaeffler and the Schaeffler Group on August 15, 2012. Id. ¶ 12.

When the IRS issued an Information Document Request ("IDR") to Schaeffler in September 2012, Schaeffler invoked "all privileges and protections that exist under U.S. law — including, but not limited to, the attorney-client privilege, the work product doctrine, 26 U.S.C. § 7525, and the common interest doctrine — to prevent the disclosure of any privileged and protected information, including, but not limited to, tax opinions." Id. ¶ 13. On October 19, 2012, Schaeffler's counsel met with the IRS to discuss "the withdrawal or narrowing of the scope of [the IDR] . . . in order to avoid a costly and time-consuming privilege fight," but the "IRS refused to withdraw or narrow the scope of [the IDR]." Id. ¶ 15. On November 8, 2012, the IRS issued a second IDR requesting "[a]ll tax opinions and tax analysis that discuss the U.S. tax consequences of any and all steps of [Schaeffler's] restructuring." Id. ¶ 16.

Through July 2013, the IRS issued 86 IDRs requesting information regarding Schaeffler's 2009 and 2010 tax returns, and Schaeffler has in response produced tens of thousands of pages of documents. Id. ¶ 17. In petitioners' view, "Schaeffler has provided the IRS with voluminous factual and reporting information necessary to conduct the examinations of the 2009 and 2010 tax returns . . . [including] the operative refinancing and sales agreements, transaction documents and corporate chronologies related to the refinancing and restructuring, legal and tax organizational charts, detailed tax calculations with specific instructions and references to the returns under exam, financial data, and valuation reports used to prepare the tax returns under audit." Id. ¶ 18.

E. The Instant Motion to Quash

On June 25, 2013, the IRS issued an administrative summons to Ernst & Young. Id. ¶ 26; see also Declaration of Paul Doerr, filed Nov. 26, 2013 (Docket # 20) ("Doerr Decl."), ¶ 5. In relevant part, the IRS Summons commanded Ernst & Young to: "Provide all documents created by Ernst & Young, including but not limited to legal opinions, analysis and appraisals, that were provided to parties outside the Schaeffler Group, that relate to (1) the debt restructuring of Schaeffler Group's approximately €11 billion debt for the purchase of Continental AG or (2) the restructuring of the Schaeffler entities in conjunction with the debt restructuring." IRS Summons (emphasis in original).

On July 12, 2013, petitioners filed this action pursuant to 26 U.S.C. § 7609(b)(2) to quash the IRS Summons on the ground that "it seeks 'legal opinions' and other confidential advice that are protected from disclosure by both the work product doctrine and the attorney-client privilege, as extended to EY pursuant to the tax practitioner privilege of 26 U.S.C. § 7525." Pet. at 1-2; see also Amended Petition to Quash Internal Revenue Service Summons, filed Nov. 8, 2013 (Docket # 14) ("Am. Pet."). Later, petitioners submitted a privilege log.[1] The parties filed briefs and other documents regarding the merits of the petition.[2] At the request of the Court, see Order,

---

[1] See Notice of Filing of Volumes 1 to 4 of the Privilege Log, filed Nov. 6, 2013 (Docket # 12); Notice of Filing of Volumes 5 to 8 of the Privilege Log, filed Nov. 22, 2013 (Docket # 17); Notice of Filing of Volume 9 of the Privilege Log, filed Dec. 20, 2013 (Docket # 24); Notice of Filing of Volume 10 of the Privilege Log, filed Dec. 30, 2013 (Docket # 27); see also Notice of Filing of Amended Volumes 1-10 of the Privilege Log, filed Jan. 17, 2014 (Docket # 32).

[2] See Memorandum of Law in Opposition to Petition to Quash and in Support of Summary Enforcement, filed Nov. 25, 2013 (Docket # 18) ("Opp. Mem."); Doerr Decl; Memorandum of Law in Reply to Respondent's Answer, filed Dec. 18, 2013 (Docket # 23) ("Pet. Reply"); Supplemental Declaration of M. Todd Welty in Support of Schaeffler's Petition to Quash Summons, dated Dec. 12, 2013 (attached to Pet. Reply); Second Supplemental

dated Apr. 16, 2014 (Docket # 45), petitioners submitted a copy of the EY Tax Memo for in camera inspection. That memorandum, together with its cover letter, have been filed under seal. See Ernst & Young Tax Memorandum, filed under seal on May 8, 2014 (Docket # 53).

## II. DISCUSSION

### A. Attorney-Client/ Tax Practitioner Privilege

Petitioners argue that the Ernst & Young documents are privileged and that no waiver of this privilege occurred when they provided the documents to the Bank Consortium because petitioners and the Bank Consortium had a common legal interest. See Am. Pet. ¶¶ 49-59.

#### 1. Governing Law

26 U.S.C. § 7525(a)(1) provides that

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

The scope of this privilege — commonly referred to as "the tax practitioner privilege" — is essentially "coterminous" with the attorney-client privilege. Evergreen Trading, LLC ex rel. Nussdorf, 80 Fed. Cl. 122, 135 (Fed. Cl. 2007); see also Valero Energy Corp. v. United States, 569 F.3d 626, 630 (7th Cir. 2009) ("This privilege is no broader than the existing attorney-client privilege. It merely extends the veil of confidentiality to federally authorized tax practitioners

---

Declaration of Marc Teitelbaum in Support of Schaeffler's Petition to Quash Summons, dated Nov. 25, 2013 (attached to Notice of Filing of Declarations in Support of Schaeffler's Petition to Quash Summons, filed Jan. 17, 2014 (Docket # 33) ("Supp. Decl. Notice")); Declaration of Dr. Walter Uebelhoer in Support of Schaeffler's Petition to Quash Summons, dated Jan. 17, 2014 (attached to Supp. Decl. Notice); Reply Memorandum of Law in Further Opposition to Petition to Quash and in Further Support of Summary Enforcement, filed Feb. 10, 2014 (Docket # 40); Supplemental Declaration of Paul Doerr, dated Jan. 21, 2014 (Docket # 42).

who have long been able to practice before the IRS . . . to the same extent communications would be privileged if they were between a taxpayer and an attorney.") (internal citations and punctuation omitted). Additionally, it has been found that waiver of the tax practitioner privilege occurs "on the same terms" as waiver of the attorney-client privilege. See Salem Fin., Inc. v. United States, 102 Fed. Cl. 793, 798 (Fed. Cl. 2012) (citation omitted); Evergreen Trading, 80 Fed. Cl. at 135. Accordingly, in applying the tax practitioner privilege, we look to the law governing attorney-client privilege. See United States v. BDO Seidman, 337 F.3d 802, 810 (7th Cir. 2003) ("Because the scope of the tax practitioner-client privilege depends on the scope of the common law protections of confidential attorney-client communications, we must look to the body of common law interpreting the attorney-client privilege to interpret the § 7525 privilege."); United States v. KPMG LLP, 316 F. Supp. 2d 30, 35 (D.D.C. 2004) ("Following as it must the text of § 7525, this Court addresses any claims of § 7525 privilege in the same manner as it does for the attorney-client privilege.").

In cases such as this where claims are based on federal statutes, the attorney-client privilege is governed by federal common law. See, e.g., Curto v. Med. World Commc'n, Inc., 783 F. Supp. 2d 373, 378 (E.D.N.Y. 2011); Crosby v. City of New York, 269 F.R.D. 267, 274 (S.D.N.Y. 2010); Lego v. Stratos Lightwave, Inc., 224 F.R.D. 576, 578 (S.D.N.Y. 2004). Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (citing In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007)); accord United States v. Ghavami, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012) (citations omitted). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys," and thus, "the

privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (quotation marks and citation omitted); accord Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 301 (E.D.N.Y. 1992). Courts acknowledge that "[w]hile the privilege confers important social benefits, it also exacts significant costs [because] [i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997) (citation omitted); accord In re Bairnco Corp. Secs. Litig., 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice"). Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its purpose" and "construe the privilege narrowly because it renders relevant information undiscoverable." Mejia, 655 F.3d at 132 (quotation marks and citations omitted).

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, . . . a burden not discharged by mere conclusory or ipse dixit assertions." In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (quotation marks and internal citation omitted); accord Ghavami, 882 F. Supp. 2d at 536. The party invoking the privilege also has the burden to show that the privilege has not been waived. See Hollis v. O'Driscoll, 2013 WL 2896860, at *1 (S.D.N.Y. June 11, 2013) (citing Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004)); accord United States v. Finazzo, 2013 WL 619572, at *6 (E.D.N.Y. Feb. 19, 2013).

In general, the attorney-client privilege is waived when "the client voluntarily discloses the documents to a third party." Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.,

2010 WL 343490, at *1 (S.D.N.Y. Feb. 1, 2010); see also In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973) ("We deem it clear that subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed . . . ."); United States v. Kerik, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008) ("Where attorney-client communications are disclosed for reasons other than obtaining legal advice to a third party at the direction of the client there is no expectation of privacy or confidentiality, and thus, the client cannot assert the privilege."). However, such a disclosure does not waive the attorney-client privilege when it is made between "parties [who] are represented by separate counsel but engage[d] in a common legal enterprise." See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995). Often referred to as the "common interest" rule or "joint defense privilege," this rule is not in fact a separate privilege but rather "an extension of the attorney client privilege." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (citation and internal quotation marks omitted). The rule

> serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel . . . . Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected . . . . The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter, . . . and it is therefore unnecessary . . . for the attorney representing the communicating party to be present when the communication is made to the other party's attorney.

Id. at 243-44 (citations and internal quotation marks omitted).

To obtain the benefit of the common interest rule, the party claiming the protection of attorney-client privilege must demonstrate "that the parties communicating: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of

formulating a common legal strategy." Ghavami, 882 F. Supp. 2d at 537-38 (quoting Sokol v. Wyeth, Inc., 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008)); accord Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 171 (S.D.N.Y. 2008); HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 71 (S.D.N.Y. 2009); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 471 (S.D.N.Y. 2003).[3] This showing must be based on competent evidence, such as affidavits, deposition testimony or other admissible evidence. Gulf Islands, 215 F.R.D. at 472; accord Chevron Corp. v. Donziger, 296 F.R.D. 168, 203 (S.D.N.Y. 2013).

Because the common interest rule requires the common interest to be legal, and not merely commercial, it "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." Bank Brussels Lambert, 160 F.R.D. at 447. "Although the distinction between a common legal, as opposed to commercial, interest is somewhat murky, a common legal interest has been defined as one in which the parties have been, or may potentially become, co-parties to a litigation . . . or have formed a coordinated legal strategy." In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL 599399, at *4 (S.D.N.Y. Sept. 26, 1997) (citations and internal punctuation omitted).

While courts have traditionally taken the view that the common legal interest must be "identical," see Terra Nova, 211 F. Supp. 2d at 496; Denney, 362 F. Supp. 2d at 415, recently

---

[3] Although we cite exclusively to federal cases in determining the privilege issues, we in some instances cite to federal cases interpreting New York law in light of the fact that New York state law on attorney-client privilege is "generally similar to accepted federal doctrine." Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002); see also HSH Nordbank, 259 F.R.D. at 71 n. 8 ("Because 'New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance,' both New York and federal case law are instructive here.") (quoting Allied Irish Banks, P.L.C., 252 F.R.D. at 170).

some courts have held that the common legal interest need only be "nearly identical,"

Egiazaryan v. Zalmayev, 290 F.R.D. 421, 434 (S.D.N.Y. 2013); United States v. Doe, 429 F.3d

450, 453 (3rd Cir. 2005); F.D.I.C. v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000).

        2.      Analysis

Although the Government seems to argue that the requested documents were not

privileged because the documents were not "intended to be . . . kept confidential," see Opp.

Mem. at 17, we need not consider this issue because we find that, to the extent that any privilege

existed, petitioners waived the privilege when they shared the documents with the Bank

Consortium.

In support of their position that the common interest rule applies to the disclosure to the

Bank Consortium, petitioners assert that the Bank Consortium and Schaeffler shared a

"predominately legal interest" in the "U.S. tax implications of any debt refinancing and

restructuring plan." Am. Pet. ¶ 55 (quoting Land Decl. ¶ 5). Petitioners contend that "[b]ecause

the Bank Consortium — under the unique circumstances of Schaeffler's Conti stock acquisition,

refinancing, and restructuring — essentially agreed to fund Mr. Schaeffler's taxes, Schaeffler

and the Bank Consortium shared a common legal interest in the taxes and tax advice." Id. (citing

declarations). They argue that "given the certainty of an IRS audit, Schaeffler and the Bank

Consortium were completely aligned in correctly assessing the U.S. tax implications and risks of

the refinancing and restructuring of Schaeffler, complying with all U.S. tax laws and regulations

in the most tax-efficient manner, minimizing potential tax liabilities, planning to defend any IRS

challenge, evaluating potential IRS audit outcomes, and, if necessary, preparing to contest in

good faith any proposed tax adjustment." Id. (citing declarations). In petitioners' view,

"[n]otwithstanding the obvious economic consequences of a tax liability, a common interest in

taxes is legal, not economic." Id. ¶ 54 (citing Terra Nova, 211 F. Supp. 2d at 498).

We accept that the Bank Consortium needed to understand in the greatest possible depth the risks to which it was subjecting itself by funding Schaeffler's personal tax liability. As Stephen Land, who represented the Bank Consortium during the negotiations with Schaeffler, put it: "the [Consortium] was concerned about the U.S. tax implications of any debt refinancing and restructuring plan, since the resulting tax consequences could materially affect the Schaeffler Group's net cash flow and assets that would otherwise be available to repay the [Consortium's] debt." Land Decl. ¶ 5. But as the Consortium's own attorney concedes, the reason why the Consortium needed access to Schaeffler's tax information was to assess its own "credit exposure." Id. ¶ 7. The Consortium worried that if there were substantial federal tax adjustments, this could lead to the "insolvency of all parties." Teitelbaum Decl. ¶ 15.

In light of these facts, we have no doubt that the Bank Consortium had an enormous stake in the tax consequences of Schaeffler's refinancing and restructuring decisions. It is also clear that predicting how the tax authorities would treat the transactions presented complex legal issues and thus required sophisticated legal analysis. But the two parties' shared interest in Schaeffler's tax liability was, in the end, an economic one: namely, a desire that the transactions receive favorable tax treatment from the federal tax authorities so that the Schaeffler Group could service its debt to the Bank Consortium. To be sure, this common economic interest depended on the resolution of legal issues regarding tax treatment. But this does not equate to a common "legal" interest as that term is used in case law.

The classic situation where parties share a common legal interest is where they are or may "potentially become, co-parties to a litigation." In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL 599399, at *4. Case law has also suggested that the

rule may apply where parties are formulating "a coordinated legal strategy." Id. (citing Bank Brussels Lambert, 160 F.R.D. at 448). But the rule does not encompass the situation where parties enter into a "joint business strategy which happens to include as one of its elements a concern about litigation." Bank Brussels Lambert, 160 F.R.D. at 447. That is essentially the situation in this case: a loan agreement between two parties where the result of future litigation is of concern to both sides because it will affect the debtor's ability to perform, but where the litigation does not involve the creditor and will work no change in the creditor's legal status.

None of the cases petitioners cite suggest that the common interest rule applies here. United States v. United Techs. Corp., 979 F. Supp. 108 (D. Conn. 1997), found that where members of a consortium shared tax advice to minimize the tax liability of their jointly owned company, they shared a common legal interest. Id. at 112. However, in that situation, unlike in this case, the parties sharing the tax information were each facing tax liabilities for any deficiency. Id. Similarly, in United States v. BDO Seidman, LLP, 492 F.3d 806, (7th Cir. 2007), the parties who invoked the common interest rule were "joint venturers" who were "making sure that they could defend their [tax shelter] product against potential IRS enforcement actions." Id. at 816. Thus, in both United Techs Corp. and BDO Seidman, the parties who shared the privileged information were in essentially the same legal position vis-à-vis the IRS as the entities who received the information. Here by contrast, Schaeffler and the Bank Consortium stood in very different positions vis-à-vis the IRS. Schaeffler owed a legal obligation to the United States to pay the tax liability resulting from the restructuring transactions while the Bank Consortium had no such obligation. The Bank Consortium, by contrast, was merely Schaeffler's creditor. Although we accept that the Bank Consortium ardently desired to minimize Schaeffler's tax liabilities and to see him prevail in any dispute with the IRS, "[a] shared desire

to succeed in an action does not . . . rise to the level of a common legal interest." Johnson Matthey, Inc. v. Research Corp., 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002); see also Terra Nova, 211 F. Supp. 2d at 496 ("The mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties."); Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) ("Although [the entities asserting a common interest] would both benefit from a judgment in favor of the plaintiff, they do not share identical legal interests. Indeed, sharing a desire to succeed in an action does not create a common interest.") (internal quotation marks omitted).

The decision in Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466 (S.D.N.Y. 2003), is instructive on this point. Gulf Islands involved an agreement where an entity called Gulf Islands Leasing leased a fractional interest in an aircraft from Bombardier Aerospace. A company affiliated with Bombardier Aerospace, Bombardier Capital, financed the lease. Litigation ultimately arose between Gulf Islands Leasing and Bombardier Aerospace. Bombardier Aerospace claimed as privileged documents it had shared with Bombardier Capital, invoking the common interest rule. Bombardier Capital alleged that "its common legal interest with Bombardier Aerospace was the interest both companies had in Gulf not breaching any of the various agreements." Id. at 472. The Court acknowledged that although Bombardier Capital may have had "a desire to ensure that the sums owed by Gulf to Bombardier Capital under its own agreements were paid," this was insufficient to invoke the common interest rule because "[a] concern to ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule." Id. at 472-73. Additionally, the Court held that "to the extent that the asserted interest could be construed to encompass a desire for Bombardier Aerospace to reach a favorable outcome in the litigation with Gulf, it is also insufficient to

invoke the common interest rule [because] [a] concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest." Id. at 473. Furthermore, the Court indicated that even if Bombardier Capital and Bombardier Aerospace had a "coordinated legal strategy" with respect to Bombardier Aerospace's litigation with Gulf, "such a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests." Id.

Here, Schaeffler's reliance on the common interest rule fails for largely the same reasons. As was true for Bombardier Capital in Gulf Islands, it is not enough that the Bank Consortium had a desire for Schaeffler to succeed in a dispute with the IRS. What is lacking is any common legal stake in Schaeffler's putative litigation with the IRS. If the Bank Consortium could have been named as a co-defendant in the anticipated dispute with the IRS, the result would undoubtedly be different. But only the Consortium's economic interests were in jeopardy. See generally In re F.T.C., 2001 WL 396522, at *5 (S.D.N.Y. Apr. 19, 2001) (finding that although the relevant individuals shared legal advice and were "concerned about the consequences of failing to comply with applicable law and regulations[,] . . . this is simply not enough to transform their mutual commercial interest in the [business endeavor] into a coordinated legal strategy"); see also Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 19 (E.D.N.Y. 1996) (finding only a common commercial and not legal interest where the relevant entities were merely "developing a business strategy one of whose components was to avoid litigation if possible").

Another case cited by petitioners, Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., similarly suggests that the common interest rule does not apply to Schaeffler's disclosures to the Bank Consortium. In Terra Nova, the plaintiff asserted that it had a common legal interest with

another party in "structuring and effectuating a credit agreement that was appropriately supported by reinsurance policies." 211 F. Supp. 2d at 497. Terra Nova found that the common interest rule did not apply, stating that "[t]he mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties." Id. The Court noted that "[i]t [was] of no moment that the parties may have been developing a business deal that included as a component the desire to avoid litigation . . . [because] such a desire does not transform their common interest and enterprise into a legal, as opposed to commercial, matter." Id. (internal punctuation and citation omitted).

The fact that Schaeffler and the Bank Consortium signed the ACP Agreement before sharing any documents does not affect our finding that the common interest rule does not apply. The ACP Agreement merely "memorialized the parties' common legal interest and provided that privileged information exchanged or otherwise communicated pursuant to the agreement would be protected from disclosure . . . ." Land Decl. ¶ 8. While a written agreement like this can be relevant to "demonstrat[ing] actual cooperation toward a common legal goal," In re Rivastigmine Patent Litig., 2005 WL 2319005, at *4 (S.D.N.Y. Sept. 22, 2005), the mere assertion of a common legal interest in a written agreement cannot create such an interest. What matters is whether there exists in actuality a common legal interest between the contracting parties. Additionally, it is well-established that "a private agreement or promise of protection cannot by itself bar non-signatories from access to documents if they are otherwise discoverable." In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL 599399, at *4 n. 3; see also SR Intern. Bus. Ins. Co. Ltd. v. World Trade Center Props. LLC, 2002 WL 1455346, at *5 (S.D.N.Y. July 3, 2002) ("[T]he fact that private parties agree that something is privileged does not make it so."); Baxter Travenol Labs., Inc. v. Abbott Labs., 1987

WL 12919, at *2 (N.D. Ill. June 19, 1987) (finding that where the parties had entered into disclosure agreements in which they agreed to keep confidential the disclosed documents, this was "not sufficient to establish a community of interest"). In other words, if no common legal interest had previously existed, Schaeffler and the Bank Consortium could not create such an interest by fiat.

In sum, we conclude that common interest rule does not apply, and thus, any attorney-client or tax practitioner privilege that attached to the documents was waived when Schaeffler shared them with the Bank Consortium.

B. Work Product Doctrine

Petitioners argue in the alternative that the documents requested by the IRS Summons are protected under the work product doctrine. See Am. Pet. ¶¶ 28-48; Pet. Reply at 2-7.

1. Governing Law

Federal law governs the applicability of the work product doctrine in all actions in federal court. Allied Irish Banks, P.L.C., 252 F.R.D. at 173; accord Weber v. Paduano, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003). The work product doctrine is codified in part in Federal Rule of Civil Procedure Rule 26(b)(3), which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party shows substantial need and an inability to obtain the substantial equivalent to the documents without undue hardship. The purpose of the work product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510–11 (1947)). The work product

doctrine protects materials prepared not only by attorneys but also by their agents. Costabile v. Westchester, N.Y., 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (citing cases). The party asserting work product protection "bears the burden of establishing its applicability to the case at hand." In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (citing cases). That party must show "that material it seeks to protect (1) was prepared in anticipation of litigation and (2) was prepared by or for a party, or by his representative." Koch v. Greenberg, 2012 WL 1449186, at *5 (S.D.N.Y. Apr. 13, 2012) (citing In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d at 383–84).

Because the work product protection arises only for materials "prepared in anticipation of litigation," the doctrine is not satisfied merely by a showing that the material was prepared at the behest of a lawyer or was provided to a lawyer. Rather, the materials must result from the conduct of "investigative or analytical tasks to aid counsel in preparing for litigation." Costabile, 254 F.R.D. at 164 (citation omitted). Additionally, the Second Circuit has interpreted the "in anticipation of litigation" requirement as asking whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Adlman, 134 F.3d at 1202 (internal quotation marks and citation omitted) (emphasis in original). Thus, the work product protection does not apply to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation . . . [e]ven if such documents might also help in preparation for litigation." Id. In determining whether the work product doctrine applies, a court must ask "not merely whether [the party invoking the privilege] contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'"

Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting Adlman, 134 F.3d at 1204).

A party invoking the work product doctrine need not have anticipated the specific litigation in which the protection is actually invoked. See Garrett v. Metro. Life Ins. Co., 1996 WL 325725, at *4 (S.D.N.Y. June 12, 1996) ("[A] document does not have to be created in anticipation of the current litigation."); Bruce v. Christian, 113 F.R.D. 554, 561 (S.D.N.Y. 1986) ("The fact that the memoranda were not prepared for the present litigation is not determinative, for the Supreme Court has noted that 'the literal language of the Rule [26(b)(3)] protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.'") (quoting F.T.C. v. Grolier, Inc., 462 U.S. 19, 26 (1983)). Thus, we reject the Government's contention that invocation of the work product doctrine requires petitioners to show that they "anticipated . . . a specific litigation over a future IRS summons to EY relating to the Conti stock acquisition." Opp. Mem. at 15.

2. Waiver of Work Product Protection

Before addressing the merits of whether the documents at issue are subject to work product protection, we first examine whether any such protection was waived when Schaeffler provided the Ernst & Young documents to the Bank Consortium. As a general rule, work product protection is waived only "when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary." Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, 2008 WL 4452134, at *10 (S.D.N.Y. Oct. 2, 2008) (citations and internal quotation marks omitted); accord In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993). The proponent of the work product protection bears the burden of showing that the protection has not been waived. See Allied Irish Banks, P.L.C., 240 F.R.D. at 105.

Here, petitioners provided the EY Tax Memo and other responsive Ernst & Young documents to the Bank Consortium in furtherance of the refinancing negotiations. See Martinkat Decl. ¶ 10; Teitelbaum Decl. ¶ 21-23; Land Decl. ¶ 9. The Government contends that this disclosure constituted a waiver of any applicable work product protection because "the legal interests of Schaeffler are not necessarily identical to those of the Bank Consortium (indeed, one could easily imagine a scenario in which the Bank Consortium became an adversary of the Schaeffler Group), and the Petition does not establish that they are." Opp. Mem. at 21 n. 4. As an initial matter, the Government's argument misses the mark because there is no requirement that the disclosing and receiving parties have "identical" legal interests in order to avoid a work product protection waiver. Moreover, we find that under the applicable test, there was no work product waiver in these circumstances.

In support of its argument, the Government cites various cases in which it was found that work product protection had been waived where a document had been disclosed to a non-adversarial third party. Two of these cases involve disclosures to the Government and thus are not remotely similar to the situation presented here. For example, in In re Terrorist Attacks on Sept. 11, 2001, 293 F.R.D. 539 (S.D.N.Y. 2013), the court found that the plaintiff had waived its work product protection when it disclosed its protected information to the Government because this led the information to be widely available to the public, including the plaintiff's adversaries, by way of the Freedom of Information Act. Id. at 544. Similarly, in Bank of Am., N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166 (S.D.N.Y. 2002), this Court held that a company's work product protection had been waived when its officer provided the protected information and documents to governmental authorities because "[w]hen material is disclosed to a law enforcement agency without any agreement regarding confidentiality, there is a strong potential that the material may

ultimately become public and thus available to an adversary." Id. at 173. A third case, Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113 (S.D.N.Y. 2002), found that a company waived its work product protection when it provided its documents to an auditor. Id. at 116-17. The Medinol court based this conclusion on the fact that the auditor was entirely independent from the company. Id. at 116 (likening auditor to a "public watchdog" and stating that "in order for auditors to properly do their job, they must not share common interests with the company they audit") (emphasis omitted).

Here, the documents were disclosed in furtherance of Schaeffler and the Bank Consortium's common commercial desire to avoid Schaeffler's default and insolvency. See Teitelbaum Decl. ¶ 15; Land Decl. ¶¶ 5-7. Accordingly, both Schaeffler and the Bank Consortium had an incentive to withhold the details of their refinancing negotiations from Schaeffler's potential adversaries, including the IRS. In the cases cited by the Government, there was no showing that the parties who received the protected information had any common interest or any incentive to keep the shared information from the disclosing parties' adversaries.

Another important difference in our case is that petitioners were keenly aware of the risk of disclosing the confidential tax information to third parties and took measures to ensure that no other outside parties would see the confidential documents. Before sharing the Ernst & Young documents, petitioners entered into the ACP Agreement with the Bank Consortium which imposed on both parties "a legal obligation to maintain the confidentiality of the communications shared pursuant to the ACP Agreement." Schaeffler Decl. ¶ 22. By contractually obligating the Bank Consortium to preserve the confidentiality of the Ernst & Young documents, petitioners lessened the possibility that their adversaries, including the IRS, would obtain the confidential information. This is in contrast to the situation in Terra Nova,

where the court found that because the disclosing party had "made no effort to seek confidential treatment of the information" it had failed to show that "maintaining the secrecy of the [protected information] was of any importance to it." 212 F.R.D. at 173.

Accordingly, because petitioners and the Bank Consortium had similar interests at the time in which the disclosures were made and because the Bank Consortium was contractually required to keep the disclosed information confidential, petitioners' disclosure of the Ernst & Young documents did not "materially increase[ ] the likelihood of disclosure to an adversary." See Kingsway Fin. Servs., Inc., 2008 WL 4452134, at *10.

Furthermore, it makes no difference that, as the Government puts it, "one could easily imagine a scenario in which the Bank Consortium became an adversary of the Schaeffler Group." Opp. Mem. at 21 n. 4. The mere possibility that a dispute may arise at some point in the future between the disclosing party and the receiving party is insufficient to create a waiver of the work product protection. See Ghavami, 882 F. Supp. 2d at 541 ("[T]here is always some danger that the recipient of work product is, or will later become, an informant. But that cannot constitute a 'substantial risk' that the work product would be disclosed to the adversary. If it did, the exception would swallow the rule, and the distinction between waiver of the attorney-client privilege and waiver of work product would be rendered a nullity."); accord United States v. Deloitte LLP, 610 F.3d 129, 140 (D.C. Cir. 2010) ("[T]he possibility of a future dispute between [the disclosing party] and [the receiving party] does not render [the receiving party] a potential adversary for the present purpose. If it did, any voluntary disclosure would constitute waiver.")

Therefore, petitioners have shown that, to the extent that the Ernst & Young documents had any work product protection, this protection was not waived when petitioners shared the documents with the Bank Consortium.

3. Merits of the Work Product Protection Claim

Turning to the merits of the work product protection claim, petitioners have asserted that the work product doctrine protects each of the approximately 10,000 responsive documents that Ernst & Young prepared in furtherance of the restructuring and refinancing measures. See Am. Pet. ¶ 9. However, the only document petitioners describe in any detail is the "EY Tax Memo," which appears on petitioners' privilege log more than a hundred times in various forms. A 321-page draft of this memorandum, which has been provided to the Court for in camera review, expounds on the transactional steps that Ernst & Young proposed for the refinancing and restructuring. The memorandum contains numerous appendices that provide detailed legal analysis of the federal tax issues implicated by each step. This legal analysis makes reference to statutes, IRS regulations, IRS private letter rulings, other administrative materials, and case law. In many instances, the memorandum asserts that there is no law clearly on point and thus uses language such as "although not free from doubt," "the better view is that," "it may be argued," and "it is not inconceivable that the IRS could assert." Additionally, in explaining its recommendations for handling particular aspects of the restructuring and refinancing measures, the memorandum considers at great length the arguments and counter-arguments that could be made by Schaeffler and the IRS with regard to the appropriate tax treatment of these measures. While there is copious citation to relevant legal authority, the memorandum does not specifically refer to litigation — for example, by discussing what actions peculiar to the litigation process Schaeffler or the IRS might take or what settlement strategies might be considered. Rather, the memorandum contains detailed and thorough legal analysis as to the propriety of the planned measures and advocates what specific transactional steps should be taken.

Inasmuch as this is the only document that is described in any detail by petitioners, we

assume that the other documents listed on the privilege log are no more deserving of work product protection and thus that the EY Tax Memo represents Schaeffler's best case for application of the doctrine. We will also accept that Schaeffler believed that litigation was highly probable in light of the significant and difficult tax issues that were raised by the planned refinancing and restructuring. Accordingly, the Court is called upon to make the factual determination required by Adlman: whether this memorandum and the related documents "would have been created in essentially similar form" had litigation not been anticipated. 134 F.3d at 1202. While we have described this as a factual determination, in reality it is a counterfactual determination because it requires the Court to imagine what "would have" happened in a world where Schaeffler did not anticipate litigation as to the restructuring and refinancing transactions but everything else was exactly the same — in other words, Schaeffler still found himself acquiring the unexpectedly large share of Conti stock and still needed to engage in a refinancing and restructuring arrangement that would comply with federal tax laws.

An unstated premise of Schaeffler's argument in this petition is that there was no reason for him to engage in the detailed and complex process of resolving the "complicated and unusual" tax issues that surrounded the transaction other than to prepare for litigation. If he intends to make such an argument, it would require this Court to find that Schaeffler had no interest in complying with federal tax laws except to the extent it assisted him in the event there were an audit and subsequent litigation. However, Schaeffler has not contended — nor do we have any reason to find— that he makes efforts to comply with federal tax laws only in situations where he fears being sued. Accordingly, we assume a scenario under which Schaeffler is a legitimate businessperson who has a desire to operate his companies in accordance with the law and in accordance with his legal duties, including any fiduciary duty he owes to

shareholders.

Under this assumption, the first question the Court must consider is whether Schaeffler would have sought out the type of tax advice provided by Ernst & Young about the transaction had he not been concerned about an audit or litigation with the IRS.  Schaeffler's submissions make clear that the Conti acquisition, as well as the ensuing refinancing and restructuring measures, were enormously complex transactions that required significant legal assistance.  Schaeffler states that "[a]lthough tax issues at Schaeffler are typically handled directly by our internal tax department and with the assistance of outside tax advisors, the extraordinary U.S. tax issues were distinctly complicated and unusual, and would plainly require the efforts of a large group of advisors."  Schaeffler Decl. ¶ 10.  Similarly, Dewert states that "[a]lthough U.S. tax and legal advisers were often engaged to advise Schaeffler on U.S. tax issues, the issues implicated by the acquisition were of far greater magnitude and significance than typical . . . [and thus] a significant number of U.S. tax advisers were working to address these issues."  Dewert Decl. ¶ 6.  Additionally, the evidence from Schaeffler in this petition recognizes that, as one of the Bank Consortium's attorneys put it, there were a number of "complex" and "novel" federal tax issues "inherently" implicated in completing these transactions.  Land Decl. ¶ 4.  Indeed, the "magnitude of the financial obligations and corporate restructuring" that Schaeffler contemplated would by itself "require an effort of a very large group of tax advisors to work through the various issues."  Teitelbaum Decl. ¶ 6.  Thus, the complexity of the tax issues surrounding the relevant transactions engendered the need to hire outside attorneys and advisors as well as the need to generate the lengthy and detailed analysis contained in the EY Tax Memo.  Furthermore, any sophisticated businessperson engaging in a complex financial transaction will naturally wish to obtain advice on the relevant tax laws so that the transaction can be structured

in such a way as to receive the most favorable tax treatment possible. In other words, even in the absence of anticipated litigation, a businessperson would likely seek out the sort of tax advice that Ernst & Young provided to ensure that advantageous tax strategies are employed to their fullest potential. Accordingly, given our assumption that Schaeffler is a rational businessperson who routinely makes efforts to comply with the law, we find that, even had he not anticipated an audit or litigation with the IRS, he still would have had to obtain the type of legal assistance provided by Ernst & Young to carry out the refinancing and restructuring transactions in an appropriate manner.

As to whether Ernst & Young's advice would have been different in content or form had it known that no audit or litigation would ensue, petitioners have presented no facts suggesting that Ernst & Young would have acted any differently. To the contrary, as petitioners recognize, see Letter from M. Todd Welty, dated May 2, 2014 (Docket # 52) ("Welty Letter"), there exists legal authority demanding that tax practitioners not allow the possibility that a tax return will remain unaudited to affect the advice they give. Treasury Department Circular 230 states:

> In evaluating the significant Federal tax issues addressed in [a tax opinion], the practitioner must not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be resolved through settlement if raised.

Circular 230, § 10.35(c)(3)(iii). Similarly, a Treasury regulation regarding tax shelters states that in reaching conclusions regarding whether a particular tax position would more likely than not be sustained on its merits,

> the possibility that the position will not be challenged by the Internal Revenue Service (IRS) (for example, because the taxpayer's return may not be audited or because the issue may not be raised on audit) is not to be taken into account.

26 C.F.R. § 1.6694-2(b). In other words, when tax practitioners give advice to clients, they must

ignore the actual possibility of an audit — and, by extension, litigation — in opining on the tax implications of a transaction. Thus, when providing legal advice on the tax treatment of the restructuring and refinancing transactions, the Ernst & Young advisors had a responsibility to consider in full the relevant legal issues regardless of whether they anticipated an audit and ensuing litigation with the IRS.

It is of no significance that the EY Tax Memo may be characterized as providing an "opinion of the risks and probable outcome of litigation or other adversarial proceedings against the IRS in relation to the 2009 and 2010 refinancing and reorganization." Teitelbaum Decl. ¶ 23. It is a truism that the way in which attorneys give advice regarding the legality of proposed actions is to consider the governing legal authorities and to analyze those authorities in the context of how they would be considered by a court hearing a hypothetical dispute. Indeed, the American Institute for Certified Public Accountants Statements on Standards for Tax Services No. 1 — an authority relied upon by petitioners, see Welty Letter at 1 — states that "[a] member should not recommend a tax return position or prepare or sign a tax return taking a position unless the member has a good-faith belief that the position has at least a realistic possibility of being sustained administratively or judicially on its merits if challenged." Tax Return Positions, Statements on Standards for Tax Services No. 1, § 5(a) (Am. Inst. of Certified Pub. Accountants 2009). Petitioners themselves note that tax advisors must base their advice on some "realistic possibility that the position would be sustained on its merits." Welty Letter at 1.

Therefore, the fact that the EY Tax Memo weighs the chances of success in court for certain tax positions does not indicate that the document would have been created differently absent the anticipated litigation. Ernst & Young had an independent responsibility to engage in such legal analysis in order to advise Schaeffler on what transactional steps he should take. In

other words, to give proper advice about the tax implications of the transactions, Ernst & Young necessarily had to posit what the IRS might argue in the context of litigation and to make judgments about who would win or lose on an issue if it were decided in a court. Thus, it is not surprising that the EY Tax Memo contains phrases such as "the [IRS] may argue that" or "if the IRS were to assert." See id. at 4. But the mere fact that such phrases are used in a document does not mean that the same document would not have been created absent the anticipation of litigation. The Court has examined language of this type as used in the EY Tax Memo and has found no instance in which such phrases indicate that the authors are describing any particular anticipated litigation. Rather, these phrases are used in the same manner as they would be used in any memorandum rendering legal advice.

Thus, we conclude that had Schaeffler's tax advisors been asked to opine on the legal implications of the transactions with the knowledge that an audit or litigation would not occur, they "would have" used the same methodology to render tax advice: that is, a close analysis of the relevant legal authorities to determine how various tax positions would be tested in the crucible of litigation.

For these reasons, we find that the EY Tax Memo, as well as the related responsive documents, would have been produced in the same form irrespective of any concern about litigation. Accordingly, these documents are not protected from disclosure under the work product doctrine.

## III. CONCLUSION

For the foregoing reasons, we deny the petition to quash.[4]

SO ORDERED.

Dated: May 28, 2014
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

[4] Petitioners have sent a letter to the Court requesting a "hearing" on their petition, citing as authority 26 U.S.C. § 7604. See Letter Request for Hearing, dated Apr. 22, 2014 (Docket # 46). That request is denied because this action is not a petition to enforce a summons, which is governed by 26 U.S.C. § 7604. Rather, it is a petition to quash, which is governed by a different provision, 26 U.S.C. § 7609(b)(2), as petitioners' own pleading recognizes. See Am. Pet. ¶ 5. In any event, petitioners have not made any showing suggesting that a hearing is required. See U.S. v. Noall, 587 F.2d 123, 127 (2d Cir. 1978) (hearing under section 7604 not required where taxpayer "could have proffered appropriate affidavits"); U.S. v. Morgan Guaranty Trust Co., 572 F.2d 36, 42 (2d Cir. 1978) (no hearing required where "petitioners made no showing sufficient to call for an evidentiary hearing"); see also U.S. v. Tiffany Fine Arts, Inc., 718 F.2d 7, 14 (2d Cir. 1983) ("Unless a taxpayer opposing enforcement of a summons makes a substantial preliminary showing of an alleged abuse, neither an evidentiary hearing nor limited discovery need be ordered by the district court.") (citation and internal quotation marks omitted).

III. CONCLUSION

For the foregoing reasons, we deny the petition to quash.[4]

SO ORDERED.

Dated: May 28, 2014
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

[4] Petitioners have sent a letter to the Court requesting a "hearing" on their petition, citing as authority 26 U.S.C. § 7604. See Letter Request for Hearing, dated Apr. 22, 2014 (Docket # 46). That request is denied because this action is not a petition to enforce a summons, which is governed by 26 U.S.C. § 7604. Rather, it is a petition to quash, which is governed by a different provision, 26 U.S.C. § 7609(b)(2), as petitioners' own pleading recognizes. See Am. Pet. ¶ 5. In any event, petitioners have not made any showing suggesting that a hearing is required. See U.S. v. Noall, 587 F.2d 123, 127 (2d Cir. 1978) (hearing under section 7604 not required where taxpayer "could have proffered appropriate affidavits"); U.S. v. Morgan Guaranty Trust Co., 572 F.2d 36, 42 (2d Cir. 1978) (no hearing required where "petitioners made no showing sufficient to call for an evidentiary hearing"); see also U.S. v. Tiffany Fine Arts, Inc., 718 F.2d 7, 14 (2d Cir. 1983) ("Unless a taxpayer opposing enforcement of a summons makes a substantial preliminary showing of an alleged abuse, neither an evidentiary hearing nor limited discovery need be ordered by the district court.") (citation and internal quotation marks omitted).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORG F.W. SCHAEFFLER, INA-HOLDING SCHAEFFLER GmbH & CO. KG, SCHAEFFLER HOLDING GmbH & CO. KG, and SCHAEFFLER HOLDING, LP,

Petitioners,

v.

UNITED STATES OF AMERICA,

Respondent.

No. 13 Civ. 4864 (GWG)

**ORDER**

Upon the stipulation of the parties, it is hereby

ORDERED, that, pursuant to Federal Rule of Appellate Procedure 10(e)(2), the Clerk of Court is directed to file in the official record of this matter the following document, attached hereto, which was submitted to the Court but not made a part of the record on appeal as it was not docketed:

1. Petitioners' letter to the Court, dated April 21, 2014.

SO ORDERED:
Dated: New York, New York
August 21, 2014

GABRIEL W. GORENSTEIN, U.S.M.J.

DENTONS

M. Todd Welty, P.C.
Partner

todd.welty@dentons.com
D +1 214 259 0953

Dentons US LLP
2000 McKinney Avenue
Suite 1900
Dallas, TX 75201-1858 USA

T +1 214 259 0953
F +1 214 259 0910

Salans FMC SNR Denton
dentons.com

April 21, 2014

**BY FEDERAL EXPRESS**

Hon. Gabriel W. Gorenstein
United States Magistrate Judge
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Privileged and Confidential
*Ex Parte* For *In Camera* Review
Per Court Order dated April 16, 2014

Re: *Schaeffler, et al. v. United States of America*, Case No. 13-cv-4864
Copy of "EY Tax Memo" for *Ex Parte* and *In Camera* Review

Dear Judge Gorenstein:

Pursuant to this Court's Order dated April 16, 2014, Petitioners are providing *ex parte* for *in camera* review, version 11 of the EY Tax Memo, which is contained on the enclosed disk. This document appears on the privilege log as document 605189, volume 2. This version of the EY Tax Memo is dated November 19, 2009, and was transmitted to the Bank Consortium's U.S. tax counsel, Linklaters.

The EY Tax Memo, in whole or in part, appears on the privilege log more than 100 times with dates ranging between October 2008 and July 2010. Version 11 was delivered to the Bank Consortium on November 19, 2009, prior to the execution of the 2009 refinancing documents. As mentioned in the Petition and demonstrated by the log, there were several earlier drafts and several additional supplements and partial amendments through 2010. Based on the length and duplicative nature of these drafts, supplements and amendments, Petitioners are providing this version for purposes of judicial efficiency. If the Court wishes to see other versions, Petitioners are glad to provide those as well.

For purposes of orientation in the EY Tax Memo itself, it first provides an executive summary with ultimate legal conclusions and factual background, before detailing and analyzing the U.S. federal income tax consequences and risks associated with each of the transactional steps of the refinancing and restructuring. Accompanying each transactional step is a factual description of the step, an itemized list of U.S. federal income tax issues implicated by the step, a summary legal and tax analysis of those issues, and references to relevant portions of the Appendices that accompany the EY Tax Memo. The Appendices contain detailed U.S. federal income tax and legal analysis (including, for example, analysis of particular cases and statutes and potential arguments of Schaeffler and the IRS for any future adversary proceeding).

Case: 14-1965 Document: 32 Page: 107 09/05/2014 1312779 108
SPA-38

AUG-21-2014 14:57 P.05

DENTONS

Hon. Gabriel W. Gorenstein
April 21, 2014
Page 2

Salans FMC SNR Denton
dentons.com

Petitioners' counsel is available to discuss this matter *in camera* and ex parte with the Court to prevent any waiver of any privileges or protections.

Sincerely,

Dentons US LLP

By: ______________________
M. Todd Welty, P.C. Partner
By: M. Todd Welty, President

#2115764

TOTAL P.05

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2014, a true and correct copy of the foregoing was electronically submitted with the clerk of the Court for the U.S. Court of Appeals for the Second Circuit using the electronic case files system of the Court. The foregoing has also been sent to all counsel of record via the Court's ECF filing system.

/s/ M. Todd Welty
M. Todd Welty